The evidence was sufficient to authorize the jury to find against the defendant's sole defense of insanity, made under the general plea of not guilty.
 No. 15495. JULY 3, 1946.
Jesse R. McKethan was found guilty, without a recommendation, of the murder of George Luther Aids. His motion for new trial on the general grounds only was overruled, and to this judgment he excepted.
Since the facts and circumstances surrounding the killing bear directly on the defendant's sole defense of insanity, it has been deemed necessary to set forth at length the gruesome and sordid details of the crime.
The evidence tended to show substantially the following facts: The defendant and the deceased were young men, aged approximately twenty-one and seventeen respectively. They were intimate friends. On Sunday afternoon, October 7, 1945, at about two o'clock, the deceased, at the request of the defendant, drove the defendant and the defendant's father to a cemetery to visit the *Page 24 
graves of the defendant's mother and brothers. Later the defendant's father was put out of the automobile at his home, and then for several hours the defendant and the deceased visited various places of amusement in and around Savannah. They met friends and drank beer with them. At about 11:30 Sunday night the deceased and the defendant drove these friends to their homes and left them. Shortly thereafter the killing occurred.
The circumstances immediately connected with the killing are supplied by confessions made by the defendant. In an oral confession to a police officer, related by the officer as a witness, the defendant described the killing as follows: "He (the defendant) said . . that he and Aids drove to McKethan's home and sat there, talking in the car, and Aids pulled out a pocketbook, and, looking at it, he saw a picture belonging to him. He said the picture was in his pocketbook stolen from him some time before. He said he asked George Aids about this picture, and Aids said, `Not your picture, mine.' He said they had a little argument and Aids took his hand and touched him on the back of the neck. He said, `It made me mad, and I jumped out of the car and pulled him out and picked up something on the ground and struck him on the head and knocked him down;' that he revived and struggled with him and he got on top of him and choked him until he was still; `I got up and ran a half a block down the street; I came back and listened to his heart and could not hear it beating.' He said, `I took him then and dragged him to the gate and inside out yard.' He said he left him and went into the house and got this here pillow . . and brought it out and laid his head on it. He said he listened again and heard nothing. He said he dragged him over to the western side of the house; then he dragged the body under the house, and then he went back in the house and laid down."
The defendant's statement to the father of the deceased, as testified to by the father as a witness, was as follows: "We came by Carrol Hendrix's house and put him out; I got in the back seat and Luther was driving. When we got to the corner of Cedar and 38th I was arguing with Luther about this girl Faith Floyd. We turned and came back around the block and stopped in front of my house, arguing about a pocketbook I had lost. Luther said, `Mac, you are drinking pretty heavy, don't argue any more about it, I'll see you later;' and when he said that, `I reached down and picked up something *Page 25 
in the car and struck Luther beside the head.' . . He said they got out of the car and he choked him. He said he broke and ran about a half a block and stayed there a minute or two and came back; that he listened at his heart and felt his pulse and even opened his eyes and looked in. He said he went in the house and got a pillow and brought it out and put it under Luther's head."
In a written confession signed by the defendant, he described the killing as follows: "We drove to 37th and Paulsen Streets and put Carrol out of the car and then drove on to my home at 1101 E. 38th Street, where we stopped and sat in the car for a while talking. We then left to ride around some more, and at Cedar near 40th Street I mentioned to Luther that a picture that I had seen in his wallet had been in my wallet when it was stolen during August. He asked if I was insinuating that he had taken my wallet, and I said, `No.' He said, `Mac, you are high now and so let us forget about the wallet,' and I said, `No, I want you to tell me what you know about my wallet.' He then struck me with his hand. The car was still rolling and I started to jump out and he grabbed me; I then grabbed him and pulled him out of the car and we tussled. I then hit him over the head with some object, I don't know what, and we tussled some more, and I got on top of him and choked him to death. I listened to his heart and realized that he was dead. I got up and ran to 40th and Cedar Streets, and then I turned around and went back to the scene of the fight. This was about 12:30 or 12:45 a. m., Monday. I picked up Luther's body and put it into the front seat of the car and then drove around to my house on the 38th Street side, near a gate that leads into the yard. I went into the house, got a flashlight, and came back to the car. I had also gotten a pillow from my room and put the pillow under his head. There was some one coming by, and I waited until they passed and then removed the body from the car and dragged it into the yard and put the pillow under his head and again listened for a heart beat. I didn't hear anything and knew that he was dead. I then dragged his body under the house and left it and went into the house, after stuffing the bloodsoaked pillow under a washtub in the yard, and went to bed."
The morning following the killing, the defendant went to a drugstore and purchased a number of detective magazines for the purpose of ascertaining how to dispose of the body. At three o'clock *Page 26 
that afternoon he went to work at his regular job at the Union Bag and Paper Corporation. When he left work at about eight p. m., he carried with him two large paper bags. After arriving at his home, and approximately twenty-four hours after the killing, he secured a large butcher knife, a hatchet, and a flashlight. He went underneath the house to the body, turned it over, and heard what he thought was a groan. This noise, according to a witness, was probably escaping gas. The defendant was frightened, ran from underneath the house and down the street, but soon returned to the body. He then severed the head with the butcher knife and hatchet, using the clothing previously removed from the body as a shield to prevent blood from getting on his own clothes. He then severed the arms and legs. He took the torso, placed it in one of the bags brought from his place of work, and started down the street toward Daffin Park Lake. When the defendant was only a few steps from his home, the torso dropped from the sack onto the sidewalk, leaving a spot of blood on the sidewalk. The defendant replaced the torso in the bag and resumed his journey toward Daffin Park Lake, but before reaching there he removed the torso from the bag and threw it in tall grass in a vacant lot. He then returned home, and on successive trips took the legs, the head, and the arms and carried each to a different vacant lot and threw them in tall grass — all in the vicinity of his home, and some in close proximity to houses. When he had disposed of all portions of the body, he threw the bags in still another vacant lot. He returned to his home at about 4:30 Tuesday morning. He dug a hole approximately three feet deep underneath his house at the spot where he had dismembered the body and buried the blood-stained clothing, except the shoes, which he placed in a doghouse in his yard. He then went to bed, and on Tuesday afternoon again returned to his regular work. When he quit work at approximately 11 p. m. that day, he went by a drugstore, purchased a bottle of Creolin, a disinfectant, and went to the spot where he had thrown the torso. He poured a portion of the bottle of disinfectant over the torso, returned to his home, and poured the remainder of the disinfectant on the spot where he had buried the clothing. Each night thereafter for about a week he visited each spot where he had thrown a portion of the body and poured disinfectant over each portion. In the meantime, he talked with the deceased's family, telling them *Page 27 
that the deceased had gone to North Carolina with a French school-teacher from a vocational school. One of the deceased's legs was discovered some ten days after the killing. The defendant visited the spot where the leg was found. He was accompanied by the parents of the deceased and evidenced a desire to co-operate in the investigation. He was later arrested, readily confessed to the arresting officers, and revealed the location of the remainder of the body.
After signing a written confession, he later, in a statement to a police officer, changed the statement made in this confession relative to the circumstances of the killing. On this point, the police officer testified as follows: "He first stated that when they drove up to his home they stopped and then drove down 38th Street and turned into Live Oak Street, where he claimed the fight had taken place; later he said, `I don't want to lie any more; I want to tell you the truth about everything. If you will go back out to my home and look around right in front of the door, you will find my keys I dropped, and that is the spot where I murdered George Aids.' . . I went back and after ten or fifteen minutes looking around I found the keys right out on a line with his front door."
The officer further testified: "I said, `Now, Jesse, were you drunk that night?' He said `No, sir, I do not drink any whisky. I drink beer. I never get out of mind. I always remember what I am doing.' I said, `You remember this.' He said, `Yes, sir, I remember every detail I'm telling you.'"
The evidence showed that the defendant is abnormal sexually. The evidence tended to show that when the defendant was four years old he fell three stories into a basement, receiving a fracture of the skull, which is still evidenced by a dent in the skull; that the defendant on at least three occasions has had a mental "blackout" when he was struck on the head, and on these occasions was violent, later remembering nothing of what transpired; that the defendant has held a number of jobs, and on one of them, at a shipbuilding company, was promoted several times.
Two doctors testified as to the defendant's sanity. Both were called as witnesses by the defendant.
Dr. Edward J. Whelan testified: "I am a graduate of the University of Georgia and Georgetown University, Washington. D. C., and I have been practicing medicine in Savannah since 1926. I *Page 28 
am a member of the Lunacy Commission in Chatham County, and, as such, I have had occasion to come in contact with persons generally referred to as crazy, insane, or abnormal mentally, and have given the subject considerable study. I have known the defendant in the case, Jesse R. McKethan, about six or seven years. I first treated his brother, Dick McKethan, who at that time worked for the South Atlantic and Strachan Shipping Company; I had been doing their work, and he was referred to me. I then treated this boy occasionally for a bad heart because of flue and weakness. . . My purpose in this trial is to substantiate and verify Dr. Cleckley's findings. He is a personal friend of mine and he has come down here for the trial. He is one of the best authorities on this subject, having written several books on it. He and I went over this boy, and Dr. Cleckley, in collaboration with myself, made a report nine pages long, just as much my report as his. Dr. Cleckley is a specialist in this line, treating mental and nerve diseases. I would like to read two paragraphs from this report:
"`There arises the all-important question as to this man's sanity. Is he sane and competent or is he insane and irresponsible? Usually, I believe, this issue is determined on the point whether or not a man knows the difference between right and wrong. In the ordinary sense, I have no doubt Mr. McKethan knows the difference between what are generally regarded as right and wrong and what are so judged legally. I am sure that he can speak accurately about the crime involved in the killing of Mr. Aids. If one considers the verb know in a more serious light, it becomes apparent that to know means more than to distinguish theoretically and to be able to express in words a distinction between right and wrong. It means also to feel adequately, to evaluate and have it matter sufficiently whether one does right or wrong. There are many personalities who have excellent reasoning power and who can eloquently point out distinctions between right and wrong, who can make plans to lead good, wise, and successful lives, but who at once abandon such plans and commit foolish and sometimes criminal acts. Often such people can foresee, and can state in words accurately that they foresee, the error of such conduct; but they continue to behave in irrational or antisocial ways. Legal and moral responsibility are often complex and profound. A person may know what is wrong in the shallow or verbal sense but may not evaluate emotionally the significance of such an act.' *Page 29 
"In other words, that last paragraph in itself refers to Jesse McKethan, the defendant in this case, as having an abnormal mentality. I will read another paragraph:
"`If we now consider the deviation or abnormality which I am convinced is present, the failure to feel and evaluate life as others do, what can we say as to how this affects his responsibility or competency? As a physician I would estimate that it makes him less competent than the ordinary man and perhaps less responsible. I do not believe, however, that it makes him totally incompetent or entirely without responsibility for a deed of violence. If one considers the future, one must ask the question: what would such a personality as this be likely to do if he were again free in the community? If my estimate of the case is correct, I feel that on another occasion he would be more likely than the average man to give way again to an act of violence. I think it less likely that he would learn by the experience of one crime committed and a punishment inflicted to avoid such actions in the future than would the average man.'
"In other words, where it says `he would be more likely than the average man to give way to an act of violence,' that does not mean that he would do it out of pure meanness, but he could not help himself. . . This is an x-ray picture of the skull; you can feel the dent here in the boy's head. There is no evidence of any recent injury. That history dates back to when he was four years old when he fell out of a three-story house on Taylor Street, between Barnard and Whitaker Streets; he was then treated by Dr. Blake, who is now dead. The depression is right here (indicating); in this area he evidently had a black-out in the same manner as an epileptic. This is another x-ray picture showing the same depression from a different angle; pressure here causes him to act in the same manner as a person suffering from epilepsy when he goes into convulsive seizures. Dr. Cleckley really knows more about this than I do, but we both consider this boy homosexual, a man without any apparent love for the opposite sex. I don't mean he is a pervert; but it is an absolutely abnormal condition. Homosexual is not necessarily synonymous with perversion. I would like to read from page 4 of the report:
"`This young man is of deoplastic build with deoplastic facies. He responds to all questions in a relevant and rational manner. *Page 30 
The examiner, however, receives a strong impression that there is little emotional substance, little of ordinary human feeling behind his statements, whether he is discussing his past activities, his plans for the future, or general aspects of life. All his reactions convey a hollowness, a lack of real, vital, or intense feeling. He seems to speak with frankness about his lack of any response at all to women, stating that he can not directly feel what other people talk about in mentioning a desire for women or recounting their activities in making love to women. . . He told me of relationships with boys between the ages of eighteen and twenty-two; that he bought this Aids boy a car and paid for it; that he would go out with these boys and get them full of beer, and, by petting them and coming in close contact with them, he would get the same sensation as a normal person would with the opposite sex; he stated that there was no sex relationship between them in which the other party participated, but simply from close contact he got a certain amount of satisfaction; and we found nothing to contradict his statements. We did not contact any of the boys he had gone out with; but he made these statements, evidently proud of the fact; and it seems to me that no normal person would be proud of it. As to his cutting up the body of the deceased into parts twenty-four hours later and throwing these parts in vacant lots within sixty feet of houses in the neighborhood, I do not see how anybody with common sense could do anything like that. Assuming he went in the house and got a pillow and laid it under the head of the deceased and took off all his clothes, subsequently burying the clothes, throwing the shoes in the doghouse, leaving the body under the house, that he went back twenty-four hours later, that he moved the body and the body groaned, and because of that he proceeded to cut the body up — I think we all agree that this is abnormal; you don't have to be a doctor; but as to whether, in my opinion, he should be held criminally responsible for an act committed by him, that all depends. He can differentiate between right and wrong; but if one should hit him on that side of the head and he goes into convulsive seizures, the same as an epileptic, and gets a black-out and does not remember anything that happened, I consider that absolutely abnormal; he would be no more responsible than an epileptic in a state of convulsive seizures; he would not know what he would be doing. . . At the time he is alleged to have gotten a table and *Page 31 
broken it over the head of Dick McKethan, he knew of nothing that transpired during the whole time; it was a complete black-out. You can not judge how much pressure would be necessary on that particular place to produce a black-out. When I saw him after hitting his brother he had calmed down. . . Frankly, if I may be permitted to say so, I do not think he is a lunatic in so far as we judge lunatics; he is a menace to society due to a physical defect brought about through no fault of his; it is one of those things that could happen to any of us. My personal view is, he should be under permanent guard and made to work and be of some use to the State; that is, working upon the assumption that this killing he did was the result of a black-out; if he killed this boy without any black-out, he would be guilty of murder."
Dr. Hervy Cleckley, a graduate of the University of Georgia, Harvard University, the University of Georgia Medical School, and a specialist in psychiatry and neurology, testified as follows: "I was asked by Governor Arnall to come down and examine Jesse R. McKethan and await further orders of the court. I made this examination in the jail where he was confined. It is not only customary but usually necessary to go into the background of the patient. This x-ray shows an old fracture; you can see the depression here on the left of the skull; also the right-knee jerk was very much greater than the left-knee jerk, and the right-ankle jerk was slightly greater than the left; this does not prove but strongly suggests some abnormality from the area of the brain to the spinal cord; that is a test always made to determine a person's mental condition. He talked to me about his life, stating that he had gotten along fairly well in his work; about unhappiness in his home due to a great deal of drinking in the family on the part of his father and brother; the household apparently was not a very happy one, from what I could judge of his own account. He had apparently been arrested once or twice for small matters, such as cashing small checks that were not his checks. He had shifted jobs quite frequently; and I was particularly impressed with his lack of ordinary sex feelings. According to his own statement, he had no sex impulse towards women, although he denied having any of the ordinary impulses classed as perversion. He spoke of efforts he had made to encourage the sex impulse toward women, without success; that indicated a serious abnormality in the personality. In considering *Page 32 
the details of his actions before the killing of his friend and afterwards, I was impressed with his statement that when he saw the picture of another young man in the pocketbook of his friend, the deceased, he argued with him upon the point as to how he came by this picture, which he stated he had lost with his wallet some months ago. What impressed me was his sort of concern, which perhaps does not come through a bare recital of facts, but from the attitude I could sense in him; a rather unusual degree of attachment towards the male and the lack of any impulse towards women. He said he became totally unconscious and had no memory of any struggle after the first blow or two were passed until he awoke and found his friend dead, apparently strangled; he described his friend as being a great deal larger and more powerful. Then he spoke of other matters, which impressed me as exceptional, such as pulling the body under the house and leaving it there overnight; and I was struck by his calmness and by his apparent lack of any deep emotion. I got the impression (which is only an impression since I was not there) that he was calm during that night. He spoke of getting the knife and hatchet and cutting the body up, dismembering it; and one point that stood out was his lack of ordinary precaution in the distribution of the body; one would think the average man would seek to hide parts of the body where they would not be found; it struck me not only as careless, but decidedly abnormal. I was also impressed with his statement that he had gone to the mother of the deceased and talked with her, apparently showing no strain or anxiety, and had gone in an automobile with her to some place where they served drinks and beer. He seemed rather content in jail, and the impression I got was he did not experience what a normal person would experience under such circumstances. I would say he was free of any delusions; but though he spoke reasonably and rationally, expressing himself as regretting the deed, I got a strong impression that it was just a mask, not a temporarily assumed mask, but that his actual emotional reactions were rather trivial and not nearly as intense as one would expect in one of ordinary feelings; that was the impression I got from an examination of him in jail. I had access to a report describing his life in the past, which in general confirmed the things he told me. In this report there was testimony to indicate he might have had more direct physical interest in his own sex, in other young *Page 33 
men, than he admitted, but there were not many instances of that sort and not very strong activities along that line. There were reports stating that he would spend large sums of money on boys younger than himself. I was impressed by the fact that the report confirmed his account of the unstable unhappy household in which he was raised, the maladjustment of the father, and reports of previous attacks, in which he would lose control of himself; and he told me this too, and of an instance that occurred while at work, in which he suddenly lost control of himself and broke up things in the office; the incident about his brother, as I recall, was mentioned in the report I saw. He also stated he had had a fall and suffered a blow on the head, which may account for the fracture of the skull shown by x-ray and physical examination; those are the impressions I gained while examining him. Possibility certainly allows for this injury when four or five years old, unmistakable evidence of it being still present, as shown up by the x-ray picture; and his own statement that he has on three different occasions experienced a blankness, without being able to recall anything he did, brings up the possibility that there was a skull injury with consequent brain damage. A person subject to epileptic fits may have convulsions, or he may fall into a totally unconscious state and become violently destructive toward any one present; he would be temporarily unconscious. I am not convinced that is true in this case; I think there is a chance of that. I would think, however, to determine that as a very strong probability, he would be more likely to have more of those spells of convulsions; he reports of having them only three times. On the other hand, there are changes in him which are indisputable. I think any psychiatrist would be impressed by the true personal abnormality, a difference in the mental or emotional point of view from the normal. Then, his lack of capacity for remorse or grief, entirely different from normal; for persons of that sort we usually make the classification psychopathic personality, although he is not typical of psycopathic personality as it is usually understood. Psychopathic personality is a problem on which psychiatrists often argue. It is generally considered as applying to a person who has emotional or mental differences from the normal, consisting in an incapacity to feel what others feel. I have known people who had definite delusions, would hear voices, and yet have enough judgment left to work and *Page 34 
make a living and not harm other people. I feel McKethan can express the difference between right and wrong in words, but not in the full sense; I do not get the impression that he wholeheartedly participates, feels the significance in matters of right and wrong, or what is desirable or undesirable as the normal or average man does. I will say he is abnormal. `Insane' is not a medical term, and whether or not he should be put under that category is debatable. He is not totally responsible for his acts, and at the same time he is not totally irresponsible; that is the impression. I have tried to convey. . . There is not sufficient evidence to convince me of this man's condition. The only other things are the knee jerks; they are equal in normal persons; it does not exactly indicate insanity because the jerks are not even. If this man had a black-out, he could not remember any of that later. He told me about the fall on his head; the impression he gave me was a hard blow on the head. In the last part of my report I wrote, `I feel that on another occasion he would be more likely than the average man to give way again to an act of violence.' That is correct; I do think so. . . We do not use the word `insanity' in the profession. I believe a person may know the difference between right and wrong, and yet there is the question whether he has the will to respond to this sense of right and wrong which enters into the discussion."
The defendant's father and other witnesses testified that at times the defendant acted queerly.
A number of witnesses, including several ministers, testified that the defendant's reputation for peaceableness and lack of violence was good.
The defendant, in his statement to the jury, denied that he was guilty of murdering the deceased. He stated: "They say I killed him; if I did, I was not mentally responsible at the time. I have a clean conscience, as I did not know what I was doing when I killed him." He related his past history, including his fall at the age of four, how his father and brothers drank heavily, how one of his brothers once struck him on the head and he became violent, later remembering nothing which happened, and how he was thereafter treated by Dr. Whelan. He related how he and the deceased had bought a car together and had made trips together. With reference to the circumstances of the killing, he stated: "After *Page 35 
eating dinner, then we went with a fellow who wanted a quart of whisky, Aids knew where it was; then to Isle of Hope and other places, drinking beer and eating shrimp, and had a very good time. Then we put out Luther's cousin who was with us and went to the rink, where we picked up Carrol Hendrix and went to the Gold Star Ranch. Eight o'clock Luther said he wanted to take Fay home; me and Carrol stayed and drank beer. When Luther came back, he was very irritated and we wanted to know the trouble; he said he had an argument with someone as to who was to take her home. I suggested he phone the girl, which he did. He came back a little stiff. We went to the bar and had beer and barbecue sandwiches. I paid for the beer and Luther paid for the sandwich, which I did not eat. When he pulled his wallet out, I saw a picture of a friend of mine, and I knew there was only one picture. I did not say anything then. We carried Carrol home 11:30 and put him out. We had all been in the front seat of the automobile, Carrol in the middle. I remember it was cold weather, because it was a Ford open car, a convertible Ford. When we got in front of the house, I asked him point-blank if someone gave him that picture. I had reported the loss of my wallet and the picture some time before to the police; they said they could not make an arrest unless I had proof. I asked him what he knew about it. He denied knowing anything about it. He got mad when I accused him of being mixed up with the stealing of my wallet. Sgt. Fitzgerald said he patted me on the head; he swung at me and I saw he was mad; I had a complete black-out when he struck me in back of the head. The next thing I remember he was lying on the ground. I went in the house and got a pillow and laid it under his head; I don't know how I did it, but I dragged him around to the side of the house. I had never driven a car in my life, but I drove that car to his home. I don't know what gear I put it in. When I came back I took his clothes off and dragged him under the house and went to bed and went to sleep. The next morning I woke up and went under there and looked at it; then I went out on the sidewalk to see what was there. I noticed I did not have any keys, and I looked all over for them; I looked and saw blood spots on the sidewalk. After that I went to work that afternoon at three o'clock, and I checked out about seven or eight — I don't remember — and I came on home. On leaving the Union Bag I *Page 36 
picked up a couple of unfinished bags with no bottoms and brought them home. I went in the house and got a butcher knife I made at the Southeastern Shipyard blacksmith shop; Mr. Coursey made it for me; also on the back porch I got a hatchet and put them under the house; then I went to the Dixie Wine Shop and drank some beer for thirty minutes. I came back then and disposed of the body. The only reason I did that was because I was scared. I had heard my brother talking when drinking about how they beat prisoners to make them confess, and I told them what I did because I was scared of them. I knew if they hit me with that rubber hose they would hurt my head and I might hurt them."
This case is before the court on the general grounds. The evidence, which included confessions freely and voluntarily made by the accused, and corroborating facts and circumstances, was sufficient to support the verdict of guilty of murder, without a recommendation.
The defendant's sole defense, made under the general plea of not guilty, was insanity at the time of the alleged crime. Where such a defense is raised, the burden rests on the accused, under the presumption of sanity, "to show by a preponderance of evidence, but not beyond a reasonable doubt, that at such time he was mentally irresponsible, under the tests recognized in this State." Hubbard v. State, 197 Ga. 77 (28 S.E.2d 115);Griffin v. State, 195 Ga. 368, 375 (24 S.E.2d 399);Rozier v. State, 185 Ga. 317, 319 (195 S.E. 172); Hinson
v. State, 152 Ga. 243 (2) (109 S.E. 661).
It is the general rule in this State that the sole test of criminal responsibility is whether the accused had "reason sufficient to distinguish between right and wrong in relation" to the particular offense committed. Hubbard v. State, supra;Rozier v. State, supra; Roberts v. State, 3 Ga. 310. The only exception to this general rule is where the accused is suffering from "delusional insanity," which is not involved in this case, since the undisputed evidence showed that the accused was not suffering from this form of insanity. Accordingly, this case falls under the general rule stated. *Page 37 
On the question of the defendant's sanity, the evidence unquestionably showed that the accused is an abnormal individual. There is evidence showing, without contradiction, that the defendant received a severe blow on the head when he was four years old, which is still evidenced by a dent in the skull. The evidence tends to show that since this occurrence the defendant on occasions has suffered a temporary "black-out," when struck on the head, during which time he was violent. All the expert testimony is to the effect that, if the defendant committed the crime during one of these periods, he would be unconscious of his act, unable to remember the details of the crime, and not criminally responsible for his conduct. However, as to this phase of the case, the evidence authorized the jury to find that the crime was not committed during one of these temporary periods of insanity, as contended by the defendant. There was evidence showing confessions made by the accused, in which he gave details of his conduct as well as that of the deceased at the time of the killing. There was testimony from an arresting officer to the effect that he questioned the accused as to whether he could remember the details of the killing, and the accused answered that he remembered everything which happened; also, that the accused told the arresting officer that during the process of the crime he had lost his keys, and these keys were found by the arresting officer at the spot where the accused stated the killing occurred. Clearly the evidence authorized the jury to find that the crime was not committed during a period of temporary insanity.
This brings us to a consideration of the defendant's general sanity, apart from his periods of temporary insanity. It is evident that the accused is not a normal individual, either sexually or mentally. However, the expert testimony of the witnesses offered by the accused is to the effect that he has mental capacity sufficient to distinguish right from wrong, though probably not to the same degree as a normally intelligent individual. The evidence showed that the accused attempted to conceal the crime, going to considerable effort to do so. Under this evidence, as well as other evidence set forth in the statement of facts, the jury was authorized to find that the defendant, at the time of the crime, had reason sufficient to distinguish between right and wrong in relation to the criminal act committed; and, accordingly, to find that under the *Page 38 
test of force in this State he was criminally responsible for his act.
That the accused, though able to distinguish between right and wrong, might be unable to evaluate the quality and consequences of his act to the same degree as a normal or average individual, is no defense. Weak-mindedness alone is no defense to crime.Goosby v. State, 153 Ga. 496 (112 S.E. 467); Bowden v.State, 151 Ga. 336 (3) (106 S.E. 575); Rogers v. State,128 Ga. 67 (57 S.E. 227, 10 L.R.A. (N.S.) 999, 119 Am. St. R. 364).
All the evidence bearing upon the defense of insanity has been carefully examined. We can not say as a matter of law that the finding of the jury against such defense was unauthorized. The evidence supported the verdict, which has had the approval of the trial court; and therefore the judgment overruling the motion for new trial must be affirmed.
Judgment affirmed. All the Justices concur.