295 Ga. 96
FINAL COPY

S14A0235.  THOMPSON v. THE STATE.

NAHMIAS, Justice.

Appellant Rodney Thompson was convicted of the felony murder of his mother, Marjorie Lynch.  On appeal, he contends that the evidence presented at trial was insufficient to support his conviction and that the trial court erred in excluding expert evidence regarding his low IQ and in admitting evidence of his prior difficulties with the victim and of certain statements he made while in police custody.  As explained below, we find no merit to these contentions, and we therefore affirm.[1]

1.    (a)    Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following.  Appellant, who was then 39 years old,

---

[1] The victim was killed on June 5, 2008.  On August 12, 2008, Appellant was indicted on charges of malice murder, felony murder, and aggravated assault.  After trial on August 17-20, 2009, the jury found Appellant not guilty of malice murder but guilty of the other two charges.  The trial court sentenced him to serve life in prison for felony murder; the aggravated assault verdict merged into that conviction.  Appellant filed a motion for a new trial on September 16, 2009, which the trial court denied on February 15, 2013.  Appellant filed a timely notice of appeal to the Court of Appeals, which properly transferred the appeal to this Court on October 8, 2013.  The case was docketed here for the January 2014 term and submitted for decision on the briefs.

was living with Ms. Lynch and other family members in Barrow County. About a week before she was killed, Ms. Lynch told Appellant that if he did not start helping with the household bills, he would have to move out.

On the morning of June 5, 2008, Ms. Lynch called 911 and said that her son had just stabbed her in the back and run out of the house. Sheriff's deputies arrived at the house five minutes later, finding Appellant on the porch smoking a cigarette. When they asked who he was, Appellant said "I'm her son" and motioned toward the house. When the deputies asked if Appellant had stabbed his mother, he first said no, but when asked again, he said that he had; he was then handcuffed and put in a police car.

Inside the house, the deputies found Ms. Lynch lying on the floor of her bedroom with a crossbow bolt sticking out of her back. She was still alive, and she told one of the deputies that she had been asleep when she was shot. She also told a paramedic who arrived at the scene that "he shot me." Ms. Lynch was taken to a hospital, where she died on the operating table. The cause of death was a crossbow bolt wound to the back. The bolt that killed Ms. Lynch had a "field tip," which is fairly blunt and generally used for practice, rather than a "broad tip," which is used for hunting.

When investigators searched Appellant's bedroom, they found a crossbow and a bolt; the crossbow was in "fire" mode. A sales associate from the Bass Pro Shop testified at trial that Appellant had purchased the crossbow two weeks to two months before he killed his mother. The associate explained that he generally would explain to customers how to use the crossbow and that customers could also get demonstrations of how to use the crossbow at an in-store archery range. The associate had examined Appellant's crossbow and found that it took 150 pounds of force to cock the bow. He explained that to make the crossbow fire, it had to be manually switched to fire mode, because it could not be cocked while in safe mode. Although the associate acknowledged that crossbows can malfunction, he tested the safety mechanism of Appellant's crossbow and was unable to shoot the bow when it was in safe mode, even when he tried to make it malfunction.

Appellant was taken from the house to the sheriff's office, where he was interviewed after waiving his rights under <u>Miranda v. Arizona</u>, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). Appellant claimed that he had gone up to his mother's room to show her his crossbow, even though she was asleep, and when he walked in, the crossbow, which was loaded, accidentally went off and

3

the bolt hit her in the back. He said that this was the first time he had ever used the crossbow, which he bought to use for hunting (although he later admitted that he did not have a hunting license). Appellant admitted that his mother sometimes asked him to pay rent, which made him mad, but he claimed that he was not mad at her at the time of the incident. When asked why he did not help his mother after shooting her, Appellant said that he had heard her calling 911, so he went outside to smoke a cigarette.

After the interview ended, Appellant was moved to a conference room, where he was guarded by Investigator Matt Guthas. Although Guthas did not question him, Appellant began talking. Guthas testified at trial that Appellant said: "got into this thing with my mom this morning"; "gun"; "shot her in the back"; "good thing it wasn't steel"; and "not bad." At trial the State also presented evidence that in 1994, Appellant had pled guilty in New Jersey to threatening to kill his mother.

(b)    Appellant contends that the evidence pointed to an accidental shooting and thus was legally insufficient to support his conviction. However, "'[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" Vega v. State, 285 Ga. 32, 33

4

(673 SE2d 223) (2009) (citation omitted). When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to reject Appellant's accident defense and find him guilty beyond a reasonable doubt of felony murder based on aggravated assault. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); Smith v. State, 292 Ga. 620, 621 (740 SE2d 158) (2013); Brown v. State, 292 Ga. 454, 456 (738 SE2d 591) (2013).

2. The trial court ruled that Appellant would not be permitted to introduce expert testimony that he has an IQ of 67, which, his counsel argued, was relevant to his defense that the shooting was accidental because his mental disability prevented him from understanding how to use the crossbow properly. Appellant enumerates error in this ruling, but the trial court decided the issue in accordance with settled Georgia law.

Evidence of a criminal defendant's mental disability may be presented in support of a defense of insanity or delusional compulsion (see OCGA §§ 16-3-2 and 16-3-3); a claim of incompetency to stand trial (see OCGA § 17-7-130); or, since such pleas were authorized, a plea of guilty but mentally ill or guilty but mentally retarded (see OCGA § 17-7-131) — none of which Appellant raised

5

in this case.[2] For more than 150 years, however, this Court has consistently upheld the exclusion of evidence of a defendant's diminished mental condition when offered to support other defenses or to negate the intent element of a crime. See, e.g., State v. Abernathy, 289 Ga. 603, 607-608 (715 SE2d 48) (2011) ("'[M]ental abnormality, unless it amounts to insanity, is not a defense to a crime.'") (quoting Wallace v. State, 248 Ga. 255, 262 (282 SE2d 325) (1981)); Paul v. State, 274 Ga. 601, 603 (555 SE2d 716) (2001) (rejecting the defendant's argument that "he was entitled to introduce expert evidence of his mental impairment tending to show his lack of intent to kill," because "the expert evidence was irrelevant to the state of mind necessary to determine guilt in light of the defendant's refusal to assert an insanity defense or that he was mentally ill at the time of the conduct in question"); Selman v. State, 267 Ga. 198, 200 (475 SE2d 892) (1996) (same); Reece v. State, 212 Ga. 609, 609-610 (94 SE2d 723) (1956) ("Weak-mindedness alone is no defense to crime. The

---

[2] In addition, OCGA § 16-3-21 (d) (2), which was enacted in 1993, authorizes relevant expert testimony regarding the defendant's condition of mind at the time of the offense, including relevant facts and circumstances relating to the family violence or child abuse that are the bases of the expert's opinion, to support a justification defense in a prosecution for murder or manslaughter. See also Smith v. State, 247 Ga. 612, 619 (277 SE2d 678) (1981) (holding that expert testimony in support of a justification defense based on battered spouse syndrome would not be an improper opinion on an "ultimate fact").

6

evidence in the record that the defendant had the mentality of a child nine or ten years old does not relieve him from responsibility for crime." (citation omitted)); McKethan v. State, 201 Ga. 23, 38 (39 SE2d 15) (1946) ("That the accused, though able to distinguish between right and wrong, might be unable to evaluate the quality and consequences of his act to the same degree as a normal or average individual, is no defense."); Goosby v. State, 153 Ga. 496 [1] (112 SE 467) (1922) (holding that the trial court did not err in prohibiting a witness from testifying that the defendant was "weak-minded," because "the answer would have been immaterial, as weakness of mind would not have constituted a defense nor excused the crime"); Rogers v. State, 128 Ga. 67, 68 (57 SE 227) (1907) (affirming the exclusion of evidence that "the defendant, from the time of his childhood, had been of feeble intellect and weak intelligence," because the defense was not that he "was either an idiot or an insane person, or that he labored, at the time of the homicide, under any form of delusional insanity"); Studstill v. State, 7 Ga. 2, 3 [6] (1849) ("It is not competent to prove that the defendant is of weak mind, where it is admitted that he is neither idiot, lunatic nor insane."), overruled on other grounds in Armistead v. State, 18 Ga. 704, 707

7

(1855).[3]  See also <u>Bryant v. State</u>, 271 Ga. 99, 101 (515 SE2d 836) (1999) (affirming the exclusion of expert testimony that the defendant suffered from post-traumatic stress disorder stemming from childhood sexual abuse because that mental state was "not relevant to Bryant's defense of accident" in shooting the victim).

It should be noted that Georgia takes a more restrictive position on this issue than many other jurisdictions, where the admission of evidence relating to a defendant's deficient mental condition to support defenses other than those based on diminished mental capacity or to negate a required element of a crime has been authorized by statute or judicial decision in at least some circumstances.  See generally Paul H. Robinson et al., Criminal Law Defenses, Vol. 1, § 64 (a) (2013).  Georgia, however, is not such a jurisdiction, and if the law established by our longstanding precedent is to change, it would be better done as a matter of public policy legislated by the General Assembly.

3.      Appellant next contends that the trial court erred when it admitted, as evidence of prior difficulties between him and his mother, records showing

_____

[3] We recognize that the descriptions of mental-condition defenses in these older cases may be jarring to modern ears.

that he had previously threatened to kill his mother. We disagree.

After voir dire, the trial court addressed the State's request to present evidence that Appellant had pled guilty in New Jersey in 1994 to making terroristic threats against his mother; the proffered evidence was certified records including a police report, copies of which had been provided to Appellant's counsel in pre-trial discovery. At that point, the court ruled that the evidence would be admissible, but during trial, the court decided to exclude the evidence on the ground that the officer who had written the police report was not available to testify and the other records did not appear to be of the type required to prove a conviction.

Subsequently, on the second day of trial, the State had the district attorney's office in New Jersey send by fax and overnight delivery certified copies of Appellant's 1994 accusation, guilty plea form, conviction, and sentence. The prosecutor showed the faxed documents to Appellant's counsel that day; the next day, after receiving the overnight delivery, the State advised the court of the newly obtained records and moved for their admission into evidence to prove prior difficulties between Appellant and the victim. The trial court admitted the certified records over Appellant's objection that the State had

9

not provided him the documents ten days before trial as required by OCGA § 17-16-4 and that the prior difficulties occurred too long ago to be admissible. He raises those two arguments again on appeal.[4]

(a) Under OCGA § 17-16-4 (a) (3) (A), the prosecuting attorney generally must allow the defendant to inspect and copy, no later than ten days prior to trial, all documents that the State has within its possession, custody, or control and intends to use as evidence at trial in its case-in-chief or in rebuttal. Even assuming the State did not meet that requirement with respect to the records actually admitted to show the prior difficulties, the failure to comply with OCGA § 17-16-4 does not automatically result in exclusion of the documents at issue. Instead, the State may be prohibited from introducing evidence that was not timely disclosed only upon a showing of both prejudice to the defendant and bad faith by the State. See OCGA § 17-16-6; Bryant v.

_____

[4] Appellant also argues on appeal that the admission of these documents violated his rights under the Confrontation Clause, see U. S. Const. amend. VI, but he did not preserve that argument for appellate review. During the discussion of the documents that the State initially proffered to prove the prior difficulties, Appellant expressed concern that there would be no witness to cross-examine about the documents. However, when the State offered the certified records that were actually admitted into evidence, Appellant made no mention of his right to confrontation and instead made clear that his objections were based on OCGA § 17-16-4 and the lapse of time between the New Jersey conviction and his mother's death. Accordingly, Appellant waived review of any Confrontation Clause claim. See Sanders v. State, 290 Ga. 445, 448 (721 SE2d 834) (2012).

10

State, 288 Ga. 876, 888-889 (708 SE2d 362) (2011).

Here, although the State did not provide Appellant with timely notice of the particular certified records that were ultimately admitted, he was aware in advance of trial of the prior difficulties that the State intended to present because the State had provided him in timely fashion with the documents that it originally planned to use to prove the 1994 terroristic threats. Thus, Appellant has not shown any real prejudice from receiving the certified records on the day before they were admitted, nor has he demonstrated any bad faith by the State. We also note that Appellant did not request any of the lesser remedies, such as a continuance, available to address discovery violations. See OCGA § 17-16-6. Accordingly, the trial court did not abuse its discretion in declining to exclude the prior difficulties evidence on this ground. See Bryant, 288 Ga. at 889.

(b) Appellant also contends that the prior difficulties evidence should have been excluded because the New Jersey incident occurred more than 14 years before the crimes charged in this case. Evidence of prior difficulties is admissible because "the defendant's prior acts toward the victim, be it a prior assault, a quarrel, or a threat, . . . are evidence of the relationship between the victim and the defendant and may show the defendant's motive, intent, and bent

11

of mind in committing the act against the victim which results in the charges for which the defendant is being prosecuted." Wall v. State, 269 Ga. 506, 509 (500 SE2d 904) (1998).[5] We have explained that remoteness in time between the prior conflict and the crime now charged does not render such evidence irrelevant; instead, "the lapse in time between prior acts and the crime at issue bears on [the prior difficulties'] weight and credibility rather than its admissibility." Faircloth v. State, 293 Ga. 134, 137 (744 SE2d 52) (2013).

In this case, the evidence of Appellant's prior terroristic threats against his mother was relevant to show his motive, intent, and bent of mind when he shot his mother in the back with a crossbow, and to disprove his defense that it was an accident. That 14 years passed between the incidents was a fact for the jury to consider. See Rowe v. State, 276 Ga. 800, 806 (582 SE2d 119) (2003) (upholding the admission of testimony that the defendant had fought with and hit his wife 10 to 12 years before he shot her to death and claimed that the shooting was unintentional). In sum, the trial court did not abuse its discretion in admitting the evidence of Appellant's prior difficulties with the victim.

---

[5] This case was tried under Georgia's old Evidence Code. Under the new Evidence Code, which applies to trials beginning on or after January 1, 2013, the admissibility of this sort of "[e]vidence of other crimes, wrongs, or acts" is governed by OCGA § 24-4-404 (b).

4.     About 40 minutes into his interview at the sheriff's office, Appellant said, "I'm not going to say anything . . . . I told you everything already." The investigators, however, continued to question Appellant. Conceding that Appellant could be deemed to have invoked his right to remain silent, which could make his statements during the remainder of the interview inadmissible under Miranda, the State elected not to try to present that portion of the interview at trial.[6] The State did, however, present Investigator Guthas's testimony about what Appellant said in the conference room to which he was moved when the interview ended. Appellant contends that the trial court erred in admitting those statements, asserting that the violation of Miranda during the interview tainted the statements later heard by Guthas and that the statements were induced by the investigator's presence in the conference room.

In Rhode Island v. Innis, 446 U. S. 291 (100 SCt 1682, 64 LE2d 297) (1980), the United States Supreme Court explained that "the Miranda safeguards

---

[6] Because of this decision by the State, the trial court did not rule on whether Appellant's Miranda rights had been violated during the interview. We need not address that issue either, because this enumeration of error fails even on the assumption that a Miranda violation occurred during the interview. It should be noted, however, that there is no indication – and Appellant obtained no ruling below – that whatever questioning occurred after Appellant indicated that he did not want to say anything more rendered his subsequent statements during the interview coerced and involuntary.

come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," meaning "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." Id. at 300-301. This Court has explained the principle as follows:

> When a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statement is admissible even in the absence of Miranda warnings; a defendant's voluntary and spontaneous outburst not made in response to custodial questioning or interrogation is admissible at trial. Indeed, law enforcement officers do not have a duty to prevent a defendant from talking about the criminal incident if the defendant wishes to do so; they must not interrogate but they need not refuse to listen.

Velazquez v. State, 282 Ga. 871, 877-878 (655 SE2d 806) (2008) (citation omitted). Whether a statement was the result of interrogation or was instead volunteered is a question of fact for the trial court, and the court's ruling will not be disturbed on appeal unless it is clearly erroneous. See id. at 877.

After conducting a hearing pursuant to Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964), the trial court in this case found that Appellant's statements heard by Investigator Guthas were voluntary and not the product of interrogation, and the record fully supports that finding. Guthas testified that he did not discuss the case when he was guarding Appellant and

14

did not even ask follow-up questions after Appellant began talking. Guthas's mere presence as a guard in the conference room where Appellant was detained temporarily after he may have been improperly questioned by other officers in another room was not coercive and did not evoke Appellant's statements about the crimes.

> [T]he controlling case law excludes from the "functional equivalent" of interrogation those police statements and actions normally attendant to arrest and custody. After a suspect invokes his rights, the police may be in a situation where they choose to, and appropriately and safely can, leave the suspect, but in other situations the police may need to transport the suspect from the crime or arrest scene to a detention center, or from an interrogation room to a detention center, or arrange for the suspect to contact his lawyer or family, or deal with other logistical issues.

State v. Brown, 287 Ga. 473, 479 (697 SE2d 192) (2010) (citation and punctuation omitted). Accordingly, the trial court did not err in admitting Investigator Guthas's testimony about Appellant's statements.

Judgment affirmed. All the Justices concur, except Melton, J., who concurs in judgment only as to Division 2.


BENHAM, Justice, concurring.

15

I concur fully in the opinion as it is an accurate interpretation of the current state of the law. I write only to expound on the reference in Division 2 concerning persons with diminished capacities which notes that any change in the treatment of such persons in the criminal context is a matter of public policy for the legislature to determine. In Georgia, a person charged with a felony may be found guilty but mentally retarded and as such may be temporarily hospitalized (OCGA § 17-7-131), but is otherwise treated as any other criminal defendant. The Supreme Court of the United States has already determined that offenders with intellectual disabilities (or, in more dated vernacular, the "mentally retarded") have less culpability than average criminals. Atkins v. Virginia, 536 U. S. 304, 316-320 (122 SCt 2242, 153 LE2d 335) (2002) (ultimately holding that mentally retarded offenders are not subject to the death penalty). See also Nevins-Saunders, Elizabeth, *Not Guilty as Charged: The Myth of Mens Rea for Defendants with Mental Retardation*, 45 U.C. Davis L. Rev. 1419 (2012). It is therefore not a stretch to conclude that a more balanced approach to dealing with offenders with intellectual disabilities in the criminal justice system is warranted in today's society. As Georgia moves forward with various criminal justice reforms, the General Assembly should consider

expanding its treatment of offenders with intellectual disabilities and look for ways to reform substantive laws, evidentiary rules, affirmative defenses, sentencing, and punishment for offenders with intellectual disabilities in light of the fact that they may be less culpable for their actions than others without such disabilities.

I am authorized to state that Justice Hunstein joins in this concurrence.

Decided April 22, 2014,

Murder. Barrow Superior Court. Before Judge Motes.

Kathleen J. Anderson, for appellant.

J. Bradley Smith, District Attorney, Samuel E. Skelton, Deborah S. Wilbanks, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine L. Iannuzzi, Assistant Attorney General, for appellee.