**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 27, 2015**

# In the Court of Appeals of Georgia

A15A1314. BROWER v. THE STATE.

BARNES, Presiding Judge.

The appellant, Connie Brower was convicted of four counts of kidnapping, two counts of possessing a hoax device, two counts of terroristic threats and possession of a knife during the commission of a felony, following which she filed a motion for new trial, which she later amended. The trial court denied her motion and she now appeals and contends that she was prevented from fully presenting a defense because the trial court excluded the testimony of her expert witness about Brower's Post-Traumatic Stress Disorder ("PTSD").

On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the appellant no longer enjoys a presumption of innocence. *Gresham v. State*, 246 Ga. App. 705 (541 SE2d 679) (2000). The facts, so viewed and as stated in the appeal of the appellant's husband

and co-defendant, Robbie Brower, *Brower v. State*, 298 Ga. App. 699 (680 SE2d 859) (2009), demonstrate that

> [Robbie] Brower and [the appellant] entered the law office of the lawyer who had represented him in a previous criminal case and who [Robbie] Brower claims was guilty of "gross misfeasance" in handling his case. They first encountered three female members of the office staff.
>
> The receptionist was standing in the doorway of the legal assistant's office when she heard the office door open, but before she could turn to see who it was, someone grabbed her jacket, asked where the attorney was, and when she told him, pushed her to the very last office where the attorney was working. When they got to the office, [Robbie Brower] had her sit in a chair inside the office door. At that point [Robbie Brower] complained that the attorney had ruined his life and he had waited 11 years for revenge. The attorney offered to pay [Robbie] Brower, but [Robbie] Brower said no, that he wanted revenge. [Robbie] Brower ordered the attorney to go stand in a corner, and when the attorney kept turning around, [he] told [the appellant] to put duct tape over the attorney's mouth, and she also taped his hands.
>
> The legal assistant heard someone tell the receptionist to go to the back, and then [the appellant] entered the legal assistant's office and told her to go to the back of the office. When she did not comply immediately, [the appellant] grabbed the legal assistant by the arm "real hard," and said, "You better go to the back before I push you." [The appellant] had a wrapped-up package with her that the legal assistant assumed was a

2

gun. The legal assistant then started walking to the back of the office. After [the appellant] locked the door to the office, she pushed open the door to another office and "got" another of the office staff. [The appellant] "caught" this second woman by the arm and told her to come with [her]; [the appellant] pulled and pushed her down the hall. When they arrived in the attorney's private office, they found the receptionist and the attorney with [Robbie Brower]. [He] told them to sit down. What appeared to be a bomb was on the attorney's desk.

[Robbie] Brower and [the appellant] were dressed in what appeared to be camouflage jackets and pants. The attorney attempted to find out what [Robbie] Brower wanted and negotiate with him, but [he] made [the attorney] stand in a corner facing the wall. [Robbie] Brower told the office staff that he did not want them, he would not hurt them, he wanted the attorney, and he would release them in about five minutes. The women did not feel free to leave and the legal assistant did not believe that [Robbie] Brower would not hurt her; she was held against her will and she did not go to the back office of her own volition.

After holding the women for ten to thirty minutes, depending upon the staff's estimates, [Robbie] Brower opened the back door of the office and, after allowing the women to get their purses, released the women. He told them before they were released that he had a bomb and he wanted the women to tell everyone that they were armed and dangerous and meant business. As they were leaving, [the appellant] asked [Robbie] Brower if he wanted to hold one of them hostage, but he said no. Two of the women went to a nearby office and called 911. . . .

After this, [Robbie] Brower taped the attorney to a rolling chair and rolled him from the back to the front of the office. [The couple] and the attorney remained in the front office for most of the remainder of the day while the Browers watched the TV reports about the hostage situation, threatened revenge on the attorney, negotiated with the authorities, and sent out demands. . . .

After conversations with the attorney and some of the official negotiators, the attorney convinced [Robbie] Brower to surrender. Finally, after many hours, [the couple] attempted to come out; they were directed to get on their knees, and then [Robbie] Brower became upset and, threatening to break the attorney's neck, forced him back in the building and again locked him in a room. The next morning . . . [the couple] decided to attempt to surrender again. And, this time they were able to do so successfully.

Id. at 699-701.

Before trial, the State filed a motion in limine to exclude testimony from the appellant's expert witness about an affirmative defense of justification, specifically claiming battered woman's syndrome and that the appellant suffered from PTSD. At the pre-trial hearing, the appellant abandoned the battered woman's syndrome defense, but argued that she was justified in committing the crimes because she suffered from PTSD which negated her intent to commit the charged crimes,

4

essentially asserting a diminished mental capacity defense. The trial court reserved ruling on the State's motion in limine at that tine.

During trial, outside the presence of the jury, the appellant proffered the testimony of her expert, Dr. Marti Loring, a PTSD specialist at the Center for Mental Health and Human Development. Dr. Loring explained that PTSD is diagnosed using four tools – the trauma symptom checklist, the clinician-administered PTSD scale, the trauma belief inventory, and the Horowitz impact of events scale. She further explained that the indicators of PTSD are often flashbacks to the traumatic events, trouble concentrating, hyper-vigilance, depression, hopelessness, and desperation. Dr. Loring recalled that she had met with the appellant on three different occasions for approximately 20 hours, and after interviewing members of her family and her former therapist, diagnosed the appellant with PTSD.[1] She attributed the PTSD to several traumatic events in the appellant's life, including her father's desertion of the family when she was a child, sexual abuse by her stepfather, exacerbated by the appellant's mother being forced to watch, the verbal and physical abuse of her first husband, and his eventual suicide in 1999 while they were in bed together.

---

[1] The appellant was apparently diagnosed with PTSD in 1999 after her first husband's suicide.

Dr. Loring explained that the PTSD was relevant to the appellant's criminal case because the appellant believed that Robbie Brower was going "into a situation where he was going to die," and that because she had lost one husband in traumatic circumstances, the appellant would act, given a traumatic trigger, to keep her current husband alive. Dr. Loring further offered that upon a triggering event, PTSD sometimes impairs judgment, and that because of her PTSD, the appellant "felt like she had no other alternative" but to help Robbie Brower commit the crimes at issue.

The trial court granted the State's motion in limine to exclude the expert testimony, after concluding, among other things, that the appellant had testified to many of the same facts, Dr. Loring's testimony would invade the province of the jury, the expert testimony would provide a "cloak of validation" to the appellant's testimony, and also that, contrary to the appellant's assertion, neither the affirmative defense of justification nor of coercion applied to the facts of the case.

On appeal, the appellant contends that her convictions must be set aside because she was denied the right to present a defense when the trial court refused to allow her expert to testify about her PTSD diagnosis. The appellant does not assert that it was being used as an affirmative defense, but rather that PTSD was relevant

6

to supply an interpretation of the facts outside of the ken of the average layman, specifically the impact of PTSD on her intent to commit the crimes.

"Expert opinion testimony . . . is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman." *Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981). The appellant contends that the excluded testimony was relevant to her only defense, which appears to be that she could not form the requisite intent to commit the crimes charged because she suffered from PTSD. [2]

> Evidence of a criminal defendant's mental disability may be presented in support of a defense of insanity or delusional compulsion (see OCGA §§ 16-3-2 and 16-3-3); a claim of incompetency to stand trial (see OCGA § 17-7-130); or, since such pleas were authorized, a plea of guilty but mentally ill or guilty but mentally retarded (see OCGA § 17-7-131) — none of which Appellant raised in this case. For more than 150 years, however, [our Courts have] consistently upheld the exclusion of evidence of a defendant's diminished mental condition when offered to support other defenses or to negate the intent element of a crime. See,

---

[2] "[I]t has not yet been determined whether post traumatic stress disorder . . . [is an] admissible scientific principle[] in Georgia.*" Prickett v. State*, 220 Ga. App. 244, 247 (3) (469 SE2d 371) (1996), overruled in part on other grounds, *State v. Belt*, 269 Ga. 763, 764, n. 1 (505 SE2d 1) (1998). See *Carter v. Glenn*, 243 Ga. App. 544, 549 n. 2 (533 SE2d 109) (2000).

e.g., *State v. Abernathy*, 289 Ga. 603, 607-608 (715 SE2d 48) (2011) ("'[M]ental abnormality, unless it amounts to insanity, is not a defense to a crime.' ") (quoting *Wallace v. State*, 248 Ga. 255, 262 (282 SE2d 325) (1981)); *Paul v. State*, 274 Ga. 601, 603 (555 SE2d 716) (2001) (rejecting the defendant's argument that "he was entitled to introduce expert evidence of his mental impairment tending to show his lack of intent to kill," because "the expert evidence was irrelevant to the state of mind necessary to determine guilt in light of the defendant's refusal to assert an insanity defense or that he was mentally ill at the time of the conduct in question")[.]

*Thompson v. State*, 295 Ga. 96, 98-99 (2) (757 SE2d 846) (2014). Moreover,

[i]t should be noted that Georgia takes a more restrictive position on this issue than many other jurisdictions, where the admission of evidence relating to a defendant's deficient mental condition to support defenses other than those based on diminished mental capacity or to negate a required element of a crime has been authorized by statute or judicial decision in at least some circumstances. Georgia, however, is not such a jurisdiction, and if the law established by our longstanding precedent is to change, it would be better done as a matter of public policy legislated by the General Assembly.

Under theses circumstances the trial court did not err in excluding the expert's testimony regarding PTSD. Accord *Thompson*, 295 Ga. at 98-99 (2) (trial court did not err in excluding expert testimony that appellant has an IQ of 67, which he asserted

was relevant to his defense that the shooting was accidental because his mental disability prevented him from understanding how to use the crossbow properly.)

*Judgment affirmed. Ray and McMillian, JJ., concur.*