305 Ga. 281
FINAL COPY

S18A1538.  VIRGER v. THE STATE.
S18A1539.  CAVE v. THE STATE.

NAHMIAS, Presiding Justice.

Darius Virger and Alexis Cave were tried together for crimes related to the beating and death of Diarra Chappell, a 13-month-old child who lived with them.  Virger was convicted of malice murder, Cave was convicted of felony murder, and both were convicted of other offenses.  On appeal, both Virger and Cave challenge the legal sufficiency of the evidence supporting some of their convictions and contend that the trial court erred by not severing their cases for trial.  Virger also contends that the trial court erred by failing to strike a juror for cause, by physically separating the co-defendants during their trial, and by overruling several of his evidentiary objections.  Cave contends that the trial court erred by allowing the admission of impermissible character evidence, by excluding expert testimony about her mental condition, and by denying her motion for a continuance.  Our review of the record, however, reveals no

reversible error, so we affirm the convictions in both cases.[1]

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Virger and Cave began their tumultuous marriage in May 2011, when Cave was 16 years old and Virger was almost 26. Cave became pregnant shortly thereafter, but the couple separated in October. Virger and Cave's daughter A. V. was born in April 2012. A few months later, Virger began dating Tina Chappell, who had recently given birth to Diarra. Virger, Chappell, and Diarra began living together in a townhouse in

---

[1] Diarra was killed on February 15, 2013. On June 12, 2015, a Douglas County grand jury indicted both appellants, individually and as parties to a crime, for malice murder, three counts of felony murder (based on aggravated battery for causing blunt impact injuries to Diarra's head that rendered her brain useless, first-degree child cruelty for inflicting blunt impact injuries to Diarra's head, and second-degree child cruelty for causing Diarra cruel and excessive physical pain by failing to seek necessary medical care for her), aggravated battery for causing retinal hemorrhages that rendered Diarra's eyes useless, first-degree child cruelty for inflicting abrasions and contusions on Diarra's face and body, and aggravated sexual battery. At a joint trial from November 30 to December 15, 2015, the jury found Virger guilty of all charges. The jury found Cave guilty of felony murder based on second-degree child cruelty, first-degree child cruelty, and aggravated sexual battery, but not guilty of the remaining counts. The trial court sentenced Virger to serve life in prison without the possibility of parole for malice murder, a 15-year consecutive term for first-degree child cruelty, and a 25-year consecutive term for aggravated sexual battery. The court merged the aggravated battery count, and the felony murder counts were vacated by operation of law. Cave was sentenced to serve life in prison for felony murder, a 20-year consecutive term for first-degree child cruelty, and a 25-year consecutive term for aggravated sexual battery. Virger and Cave both filed timely motions for new trial through their respective trial attorneys, which they both later amended with new counsel. After holding an evidentiary hearing, the trial court denied Virger's motion on April 20, 2018 and Cave's motion on May 2, 2018. Virger and Cave filed timely notices of appeal, and their cases were docketed in this Court for the August 2018 term. Virger's case was submitted for decision on the briefs, and Cave's case was orally argued on November 6, 2018.

Douglas County. In October 2012, Chappell was arrested, and Virger began taking care of Diarra by himself while Chappell was in jail.

In November 2012, Virger and Cave began seeing each other again, but their renewed relationship was fraught with jealousy, arguments, and violence; Cave claimed that Virger was physically abusive toward her on a daily basis. Several text messages from Cave referenced Virger's physical abuse toward her, asking him to "stop putting [his] hands on [her] and saying that she was "not [his] personal punching bag." Virger sent a text threatening "to beat [Cave's] ass." Many texts from Cave's phone also indicated that she was resentful of Virger's relationship with Chappell and Diarra; several texts Cave sent in November and December 2012 accused Virger of not caring about her because he had a "new family with a new daughter" whom he loved "more than [his] real family." Cave also sent her father a text in November saying, "idgaf about [Diarra]."[2]

In January 2013, Cave and A. V. moved into the townhouse with Virger and Diarra. Virger continued acting as the primary caretaker for Diarra, and

---

[2] Cave acknowledged at trial that "idgaf" meant "I don't give a f*ck."

Cave spent more time caring for A.V. On January 8, Cave sent a text to Virger saying that A. V. "gets less because you have to take care of Diar[r]a" and "I just can't stand the fact that she's taking away from our daughter." In early February, Cave sent Virger a text telling him, "You obviously think Diarra is really your daughter and you clearly care about her more than everyone else in the house." In addition, during January and February, Virger and Cave sent each other hundreds of text messages in which they argued, cursed, and accused each other of infidelity, although many of those messages were immediately followed by texts professing their love for each other.

On several occasions after Virger began taking care of Diarra, witnesses noticed bruises on her, including bruises on her upper arms, forehead, and cheeks and around one of her eyes. During a visit with Virger and Diarra at the jail on December 22, 2012, Chappell observed that Diarra had a black eye. When Chappell asked Virger about it, he replied that Diarra had fallen while trying to pull herself up. In early February 2013, Virger's aunt noticed that Diarra had a black eye, and Virger claimed that Diarra was learning to walk and had fallen down.

On February 14, Virger and Cave's texts to each other indicate that they

argued throughout the day, that Cave left the townhouse sometime around 9:00 p.m. because she was angry with Virger, and that she returned a little before 10:00 p.m. Surveillance video from a convenience store near the townhouse shows that Virger bought two Honey Buns around 10:30 p.m. At 2:00 a.m. on February 15, Cave sent Virger a text saying, "F*ck you. I'm so tired of you. All you wanna do is hurt people and blame it on me. You are evil and you don't know how to love anybody." Around 6:45 a.m., a woman staying at another townhouse in the complex saw a man and a woman hurrying from Virger and Cave's front door toward their car in the parking lot and then driving off in a rush; they did not have any children with them.

More than two-and-a-half hours later, at 9:24 a.m., Virger and Cave brought Diarra to a hospital. She had significant bruising across her head and ear, and she was unresponsive and in cardiac arrest. Virger told medical staff that Diarra had fallen from a highchair the day before; that he had given her a bottle that morning and then left the room to make a phone call; and that when he returned to check on her, her left arm was shaking and she was not breathing. While they were attempting to resuscitate Diarra, a doctor and nurse removed her diaper to take her temperature; they noticed that there was tearing to the

5

outside of her rectum, which "was extremely dilated and open." Diarra was declared dead at 9:54 a.m.

Later that day, Virger and Cave were interviewed separately by sheriff's officers; their video-recorded interviews were played for the jury at trial. Both appellants acknowledged that no one else had taken care of Diarra during the preceding couple of days. They both claimed that Diarra had fallen from a highchair the previous afternoon but had seemed fine; that she had gone to sleep around 1:30 a.m.; that Virger gave her a bottle in her crib around 8:30 a.m.; that when he checked on her about 30 minutes later, she was not breathing; and that they then got dressed, put both Diarra and A. V. in their car seats, and drove to the hospital. Both Virger and Cave denied any knowledge of Diarra's rectal injuries. When asked why Diarra was wearing a fresh diaper when she arrived at the hospital, Cave said that just before they left for the hospital, she had changed Diarra's diaper because it had been fastened together with tape and she did not want hospital staff to think they were "unfit parents." When Cave was left alone in the interview room, she said to herself, "I'm going to hell" and "I'm sorry, baby." During a search of the townhouse later that day, officers found a diaper on the floor of Diarra's room that tested positive for the presence of

blood.

A couple of days later, Cave and Chappell, who had been released from jail, were involved in a fight, during which Cave threatened to send Chappell "to be with [her] daughter." In mid-March, Cave moved out of the townhouse, and shortly after that, Chappell moved back in. After Cave discovered that Virger was seeing Chappell again, Cave sent a text threatening Virger that she was "telling" and that he was "about to be locked up."

About ten weeks after Diarra died, on June 3, 2013, Virger gave a second statement to a detective, complaining that Cave had sent him threatening voicemails; the recorded interview and the voicemails were also played at trial. In one of the voicemails, Cave said, "you want to threaten me . . . talking about oh, well if you tell . . . this gonna happen . . . well guess what motherf*cker, I ain't covering for you no more. Me and my baby are not about to pay the price for your actions. So guess what? You're going down because I'm talking to my lawyer." Virger told the detective that he suspected Cave may have had something to do with Diarra's death, although he claimed that he had never witnessed Cave being violent toward Diarra.

About a week later, Cave also provided a second statement to the

7

detective, which was also recorded and played for the jury. Cave told the following story. In the early morning hours on the day Diarra died, Diarra was in the living room with Virger when she began to cry; Virger put his hand over Diarra's mouth and nose to stop her from crying, and when Cave tried to push his hand away, he grabbed Cave by the arm and ordered her to sit down; when Virger removed his hand from Diarra's face, she was struggling to breathe and barely moving; Cave said that they should take her to the hospital, but Virger refused and slammed Cave's head against a wall. Cave claimed that she believed Virger would beat her if she tried to intervene on Diarra's behalf. When the detective asked about Diarra's head injuries, Cave told him that Virger had taken Diarra by the ankle and swung her head and body repeatedly into the back of the couch to try to wake her up. Virger then put Diarra into her crib, and he and Cave went to sleep. Around 8:30 a.m., when Virger discovered that Diarra was not breathing, he agreed to take her to the hospital. On their way to the sheriff's office after Diarra died, Virger told Cave to tell the story about Diarra falling from a highchair.

On August 26, 2013, Virger was interviewed by a detective for a third time; the recording was also played for the jury. Virger again denied that he had

8

been involved in Diarra's death. He was arrested at the end of the interview. Cave was not arrested until almost two years later, after she was indicted along with Virger in June 2015.

At the joint trial of Virger and Cave in late 2015, the State presented evidence that Diarra died from "abusive head trauma," which was caused by blunt impact injuries to her head. Her autopsy showed multiple bruises on her back, knee, forearm, back of the head, forehead, ears, cheeks, and chin; there was also a "patterned" bruise with linear, spaced marks on the right side of her face. Diarra had abrasions on her chest and abdomen and a red mark on her left ankle. The trauma to her head caused bleeding in her scalp tissues, spine, and cervical cord, under her brain, and on her retinas and around her optic nerves. Two of the State's medical experts testified that these injuries were caused by "vigorous acceleration" or "whiplash," that they did not correlate with a single fall from a highchair, and that Diarra would not have been able to move, much less grab a bottle, after her injuries were inflicted. The medical examiner testified that Diarra's injuries occurred between eight and 24 hours before her death, and a child abuse expert testified that, "had medical intervention been provided, it would have given [Diarra] the best chance of surviving" her

9

injuries.

Diarra's autopsy also showed that she had a "fresh" hemorrhage in her dilated rectum and tearing on its surface, which was consistent with forceful penetration. When asked by Cave's counsel if Diarra's rectal injuries could have been caused by constipation or a hard stool, the medical examiner said "that would be a remote possibility." The State's child abuse expert also testified that Diarra's rectal injuries could not have been caused by the normal insertion of a rectal thermometer, and Virger and Cave both had said that Diarra was not constipated and that they did not use rectal thermometers on Diarra.

Virger did not testify at the joint trial; Cave elected to testify and recounted a story similar to the one she told during her second interview. She claimed for the first time, however, that after Virger held his hand over Diarra's mouth and nose, she sneaked upstairs and desperately searched for her phone so that she could call 911. According to Cave, her search was interrupted when she heard a thumping sound and went downstairs, where she saw Virger slamming Diarra's head and body against the couch.

### Sufficiency of the Evidence

2. Virger contends that the trial court erred by denying his motion for

10

a directed verdict of acquittal on the aggravated sexual battery count, although he does not otherwise challenge the sufficiency of the evidence supporting his convictions. In any event, it is this Court's practice in murder cases to review the record and determine whether the evidence was legally sufficient to support each of the appellant's convictions, and we apply the same test to a challenge to a denial of a motion for a directed verdict of acquittal: whether the evidence presented at trial, when viewed in the light most favorable to the verdicts, was sufficient to authorize a rational jury to find the appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See Thompson v. State, 304 Ga. 146, 149 (816 SE2d 646) (2018). See also Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).[3]

As summarized above, the evidence showed that multiple witnesses observed bruises on Diarra after Virger began acting as her primary caretaker; Virger and Cave were the only adults in the townhouse when Diarra was fatally

---

[3] We note that both Virger and Cave claim that certain evidence was improperly admitted during the trial. We address those claims below, but they do not affect our assessment of the sufficiency of the evidence. "When we consider the legal sufficiency of the evidence under Jackson v. Virginia, . . . , we consider all of the evidence presented at trial, without regard to whether some of that evidence might have been improperly admitted." Welbon v. State, 301 Ga. 106, 107 n.2 (799 SE2d 793) (2017).

11

injured; and Cave testified at trial that Virger inflicted Diarra's injuries, including the head trauma that ultimately killed the child. Virger told medical staff and investigators that Diarra had fallen from a highchair the previous afternoon and seemed fine afterwards, but two experts testified that the extremity of the child's injuries did not correlate with that kind of accident, that her death was instead the result of multiple blunt impact injuries to her head caused by vigorous acceleration, and that she would have been unable to move after being injured. This evidence was sufficient to authorize a rational jury to find Virger guilty beyond a reasonable doubt of the malice murder and free-standing first-degree child cruelty charges. See Jackson, 443 U.S. at 319. See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

As for his aggravated sexual battery conviction, Virger contends that the trial court erred by denying his motion for a directed verdict of acquittal on that count because sexual assault kits did not reveal the presence of his DNA or semen in Diarra; because the State did not present any evidence as to what object caused Diarra's rectal injuries; and because alternative theories — like a

12

hard stool or an incorrectly inserted thermometer — could have explained her rectal trauma.[4] A person commits the offense of aggravated sexual battery when he or she "intentionally penetrates with a foreign object the sexual organ or anus of another person without the consent of that person." OCGA § 16-6-22.2 (b).

The State presented evidence that Diarra suffered an aggravated sexual battery near the time Virger inflicted her other injuries. The child came to the hospital with an "extremely dilated" rectum that had tearing on its outside, and her autopsy showed hemorrhaging in her rectum, which the medical examiner testified was recent and consistent with forceful penetration. The jury also heard evidence undermining the alternative theories Virger proposed, as experts testified that it was highly unlikely that the injuries could have been caused by constipation, a hard stool, or normal insertion of a thermometer, and both Virger and Cave said that Diarra did not have constipation and that they did not use rectal thermometers on her. See Kemp v. State, 303 Ga. 385, 389-390 (810 SE2d 515) (2018) (explaining that "'[q]uestions as to the reasonableness of

---

[4] Virger also contends that the trial court erred by denying his motion for a directed verdict as to the felony murder count based on second-degree child cruelty. As explained in footnote 1 above, however, Virger was found guilty but was not convicted of or sentenced for that felony murder charge, so his claim regarding it is moot. See Bolling v. State, 300 Ga. 694, 697 n.2 (797 SE2d 872) (2017).

13

hypotheses other than the guilt of the defendant are generally for the jury to decide, and this Court will not disturb a finding of guilt unless the evidence is insupportable as a matter of law'" (citation omitted)).

Moreover, the State was not required to prove what specific foreign object caused the child's rectal trauma, only to present evidence from which the jury could reasonably infer that such an object was used.  Cf. Lattimer v. State, 231 Ga. App. 594, 595 (499 SE2d 671) (1998) (explaining that to prove aggravated assault with a deadly weapon, "'[i]t is clear that even in the absence of the production or verbal description of the weapon used, evidence as to the nature, kind and location of the wounds inflicted by the assailant is sufficient to allow the jury to infer the character of the weapon'" (citation omitted)); Terry v. State, 224 Ga. App. 157, 159 (480 SE2d 193) (1996) (same principle for weapon used in armed robbery).  Finally, the absence of Virger's DNA or semen was not exculpatory, because if Virger had sexually assaulted Diarra, he would have committed a different crime.  The crime of aggravated sexual battery does not require proof of a sexual act involving the defendant's sex organ; to the contrary, OCGA § 16-6-22.2 defines the penetration at issue as being with a "foreign object" and specifically excludes sex organs from the definition of

14

"foreign object." See OCGA § 16-6-22.2 (a) (defining "foreign object" as "any article or instrument *other than* the sexual organ of a person" (emphasis supplied)).

Viewed as a whole, the evidence was legally sufficient for the jury to reject Virger's alternative hypotheses as to how Diarra's rectum was injured and to find him guilty beyond a reasonable doubt of aggravated sexual battery. See Jackson, 443 U.S. at 319. Accordingly, the trial court did not err in denying Virger's motion for a directed verdict of acquittal on this count. See Thompson, 304 Ga. at 149.

3.     Cave contends that the evidence presented at the joint trial was insufficient to support her conviction for felony murder based on second-degree child cruelty and her conviction for aggravated sexual battery. We disagree.

A person commits the crime of second-degree child cruelty if she "with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). A person commits felony murder if, in the commission of the predicate felony, she proximately causes the victim's death. See OCGA § 16-5-1 (c); State v. Jackson, 287 Ga. 646, 654 (697 SE2d 757) (2010) ("Proximate causation imposes liability for the

15

reasonably foreseeable results of criminal . . . conduct if there is no sufficient, independent, and unforeseen intervening cause.").  And a person may be found guilty of a crime if she "[d]irectly commits the crime . . . or [i]ntentionally aids or abets in the commission of the crime[.]" OCGA § 16-2-20 (b) (1), (3). "'Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime,'" Cisneros v. State, 299 Ga. 841, 846-847 (792 SE2d 326) (2016) (citation omitted), and "'where the crimes involve relatives with close relationships, slight circumstances can support the inference that the parties colluded,'" see Solomon v. State, 304 Ga. 846, 848 (823 SE2d 265) (2019) (citation and punctuation omitted).

When viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that Cave and Virger were married and living together, that Diarra was in their sole care, and that Cave resented Diarra and begrudged the attention that Virger showed Diarra, which caused extreme conflict in the couple's already tumultuous relationship. Diarra had visible signs of abuse in the months before she was killed, and Cave testified that she watched Virger nearly suffocate Diarra and then slam the child's already weak

16

body repeatedly into the back of a couch, that she knew Diarra was seriously injured and needed medical care, and that Virger put Diarra in her crib instead of taking her to a hospital; rather than seeking medical attention for Diarra, Cave went to sleep with Virger; and several hours later, when Virger and Cave were unable to revive Diarra, they changed the child's diaper, got dressed, and drove her to a hospital. In addition, at 2:00 a.m., which was likely shortly after the child was beaten, Cave sent a text to Virger cursing at him, accusing him of hurting people, and calling him "evil," and a neighbor saw a man and woman, presumably Virger and Cave, hurry out of their townhouse and drive away without the child around 6:45 a.m., more than two hours before they took Diarra to the hospital.

After Diarra died, Cave told investigators Virger's invented story of Diarra's fall from a highchair — although she then was caught on video acknowledging some culpability for Diarra's death by telling herself that she was going to hell and was sorry about what happened to the baby. She then made statements to Virger indicating that she was covering for him; only months later, after Virger had renewed his relationship with Chappell and started pointing the investigators to Cave, did Cave acknowledge to investigators that

17

Virger had beaten Diarra. Finally, although the emergency room physician who treated Diarra testified that there was "little chance of recovery" from the type of brain injury she suffered, the State's child abuse expert testified that specific cooling, medicinal, and surgical procedures would have provided Diarra with "the best chance of surviv[al]."

Viewed as a whole, this evidence was sufficient to authorize the jury to find Cave guilty beyond a reasonable doubt at least as a party to felony murder based on second-degree child cruelty, and in particular to find that her and Virger's allowing Diarra to suffer rather than promptly seeking medical aid was a proximate cause of the child's death. See OCGA § 16-2-20; Jackson, 443 U.S. at 319; Grayer v. State, 282 Ga. 224, 226 (647 SE2d 264) (2007) (concluding that expert testimony that respiratory care would have been critical for a prematurely born infant victim, who "could have been viable and would thus have benefitted from supportive medical care," was sufficient to support the appellant's conviction for felony murder based on child cruelty).

Turning to Cave's conviction for aggravated sexual battery, as discussed above in relation to Virger's similar conviction, the State presented sufficient evidence that this crime occurred while Diarra was in the care of Virger and

18

Cave, so the only question is whether Cave committed the crime herself or as a party with Virger, or was merely present when Virger committed the crime. Recognizing again that "'where the crimes involve relatives with close relationships, slight circumstances can support the inference that the parties colluded,'" Solomon, 304 Ga. at 848 (citation and punctuation omitted), the evidence just recounted — and in particular Cave's admissions that she knew Virger seriously injured Diarra and that they changed Diarra's diaper before taking her to the hospital — was sufficient for the jury to rationally conclude that even if Cave did not injure Diarra herself, she aided and abetted Virger in committing the aggravated sexual battery. See OCGA § 16-2-20 (b) (3); Jackson, 443 U.S. at 319.[5]

---

[5] For similar reasons, although Cave does not challenge the evidence supporting her conviction for first-degree child cruelty for inflicting abrasions and contusions on Diarra's face and body, we conclude that the evidence was legally sufficient for the jury to find her guilty of that crime as a party with Virger. See Jackson, 443 U.S. at 319; OCGA § 16-2-20 (b) (3). We recognize that the jury's guilty verdicts on this count and the aggravated sexual battery count against Cave are somewhat inconsistent with the jury's not guilty verdicts on Cave's charges of malice murder, aggravated battery, and felony murder based on aggravated battery and on inflicting blunt impact injuries to Diarra's head. But inconsistent verdicts may simply reflect the jury's leniency or compromise. See Giddens v. State, 299 Ga. 109, 118 (786 SE2d 659) (2016); Thornton v. State, 298 Ga. 709, 713-714 (784 SE2d 417) (2016). They do not undermine the legal validity of guilty verdicts for which there was sufficient evidence for a rational jury to find guilt beyond a reasonable doubt.

4.   Virger and Cave both assert that the trial court erred by denying their motions to sever their joint trial.

> In a murder case where the death penalty is not sought, the trial court has broad discretion to grant or deny a motion for severance. In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses.

Herbert v. State, 288 Ga. 843, 845 (708 SE2d 260) (2011) (citations omitted).

This case involved only two co-defendants, who were tried for the same crimes based on largely the same evidence, and the State's theory was that they acted together to commit the crimes. See Lupoe v. State, 300 Ga. 233, 242 (794 SE2d 67) (2016). The trial court provided the jury with limiting instructions on each of the few occasions that evidence against one of the co-defendants was inadmissible against the other, and the jury is presumed to have followed those instructions. See Wade v. State, 304 Ga. 5, 10 (815 SE2d 875) (2018). Virger and Cave both argue that severance was required because they asserted antagonistic defenses. "That alone, however, is insufficient to require severance, because 'unless there is a showing of resulting prejudice, antagonistic

20

defenses do not automatically require a severance.'" Krause v. State, 286 Ga. 745, 750 (691 SE2d 211) (2010) (citation omitted). Virger and Cave have not shown any specific prejudice resulting from antagonistic defenses that would have required the trial court to grant their motions.

Cave also claims that severance was required because the strong evidence of Virger's guilt caused a "spillover effect" that tainted her defense. This case is considerably different from the Court of Appeals cases on which Cave relies, which involved little to no evidence that the defendant was even present — much less an accomplice — when the crimes occurred, juxtaposed against overwhelming evidence that the co-defendants committed the offenses. See Price v. State, 155 Ga. App. 844, 845 (273 SE2d 225) (1980) (holding that the trial court erred in denying the defendant's motion to sever because the evidence against his co-defendant was overwhelming, while the only proof that the defendant committed the crimes was the testimony of one impeached identification witness, and because the court failed to give limiting instructions to the jury regarding which evidence could be considered against which defendant); Crawford v. State, 148 Ga. App. 523, 525-527 (251 SE2d 602) (1978) (concluding that the trial of the defendant, who was charged with child

cruelty even though "there was no evidence that [he] was ever a party or witness to the physical abuse of the victim," should have been severed from the trials of his co-defendants, who had already been convicted of murdering the victim). Moreover, the jury's verdicts show that they distinguished between Cave's and Virger's culpability, because Cave was acquitted of malice murder, two counts of felony murder, and aggravated battery, while the jury found Virger guilty on all counts.

For these reasons, we conclude that the trial court did not abuse its discretion in denying the severance motions and holding a joint trial.

<u>Contentions Raised Only by Virger</u>

5.    During voir dire, one of the prospective jurors who ultimately served on the trial jury became emotional when he was questioned about whether he had experienced the death of a child. The juror explained that prior to meeting his wife, her 52-day-old child had died in 1984. He also was asked whether he had known anyone who had been sexually abused, and he responded that his stepdaughter had been sexually molested. Virger moved to strike the juror for cause, but the trial court denied the motion. Virger now asserts that the court erred because the juror's personal experiences prevented him from

22

forming an unbiased opinion about the case.[6]

"'[F]or a juror to be excused for cause, it must be shown that he . . . holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge.'" Brown v. State, 295 Ga. 804, 808 (764 SE2d 376) (2014) (citation omitted). After the juror said that the death of his wife's child could "possibly" distract him during the trial, the prosecutor questioned him, and the juror said that he did not have a fixed opinion regarding the guilt or innocence of the defendants and that he would be able to base his verdict on the evidence and the trial court's instructions. He also said that the experience of his stepdaughter's abuse would not distract him or cause him to be partial. Accordingly, the trial court did not abuse its discretion in refusing to strike the juror for cause. See Anderson v. State, 276 Ga. 389, 390 (578 SE2d 890) (2003) (explaining that the trial court did not abuse its discretion by denying the defendant's motion to excuse a juror who expressed empathy for the victims and reservations about his ability to set aside his personal experiences,

___

[6] Cave did not move to excuse the juror or join in Virger's motion. She enumerated a similar error in her brief, but withdrew it at oral argument.

23

but no fixed or definite opinion about the case).

6.      At some point during voir dire, Cave, who was sitting at the defense table with Virger, rubbed her foot on his leg.  The court's bailiffs then apparently placed a trash can between the co-defendants, and Cave moved to a different seat at the table.  This incident is not reflected in the transcript of voir dire, but during cross-examination of Cave, the prosecutor asked her about the incident, without objection by Virger.  At the conclusion of Cave's testimony, the trial court told the parties, outside the presence of the jury, "I recognize that [Cave] has just testified against Mr. Virger, I suspect that he's not overly thrilled with that.  I just was wanting to make sure that our seating arrangements, that everybody's comfortable with them, or do we need to rearrange the chairs?"  The transcript indicates that Cave's seat was changed, as the court said, "Just put her right there.  Okay."  Virger again did not object.

He now contends that the trial court's separation of the co-defendants violated his Sixth Amendment right to a fair trial.  Because the record does not show (and Virger does not contend) that he objected on this basis at trial, this claim is not preserved for appeal.  See Willis v. State, 304 Ga. 686, 718 (820 SE2d 640) (2018).  In any event, Virger cannot show that the bailiffs' or the trial

24

court's minimal separation of the co-defendants caused the jury to infer that Cave's fear of Virger was the reason for the separation. The jurors were not privy to the discussion about Cave changing seats after she testified, and although the prosecutor asked Cave about the bailiffs' placement of the trash can between the co-defendants, the State presented that evidence to *discredit* Cave's testimony that she was afraid of Virger.

7. Virger asserts that the trial court erred by admitting testimony on three occasions that he claims improperly put his character in issue in violation of OCGA § 24-4-404 (b).[7] We conclude that none of these claims requires reversal.

(a) At trial, Virger's aunt testified for the State. Before

_____

[7] OCGA § 24-4-404 (b) says:

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

25

Cave's cross-examination of the aunt, Virger objected to Cave asking her whether she had witnessed Virger abuse Cave. The trial court overruled the objection, and the aunt then testified that she had witnessed Virger put Cave in a headlock while Cave was pregnant with A. V. Cave later testified about the same incident, without objection. Virger now contends that the aunt's testimony improperly placed his character in issue and did not fall within any exception under OCGA § 24-4-404 (b). The State asserts that this evidence was "intrinsic" to the charged crimes, and therefore not covered by OCGA § 24-4-404 (b), because it was necessary to complete the story of the crimes. See Williams v. State, 302 Ga. 474, 485-487 (807 SE2d 350) (2017) (discussing intrinsic evidence and its relationship to OCGA § 24-4-404 (b)). The State's assertion is dubious, because none of the charged crimes were against Cave and the headlock incident occurred many months before the crimes against Diarra. But we need not decide whether the evidence was properly admitted, because its admission was harmless.

The strong evidence of Virger's guilt, as discussed in Divisions 1 and 2 above, easily offset any prejudice from the aunt's testimony that on one occasion long before the crimes at issue, he put Cave in a headlock. Moreover,

26

that testimony was cumulative, because Cave testified without objection about the same event (as well as several other episodes of more severe domestic violence by Virger against her). We therefore conclude that it is highly likely that the admission of the aunt's testimony did not affect the jury's verdicts. See Jones v. State, 301 Ga. 544, 551 (802 SE2d 234) (2017) (explaining that "'[t]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict'" and concluding that the trial court's admission of evidence in violation of OCGA § 24-4-404 (b) was harmless (citation omitted)).

(b) The State also presented testimony from Darlene Norton, the mother of Diarra's father's girlfriend. Norton said that she contacted Virger after Diarra's mother (Tina Chappell) was incarcerated to request that Diarra come to live with Norton and Diarra's father, but Virger refused, and he said "go f*ck yourself" when Norton said that she planned to involve the police. Virger does not claim that the substance of Norton's testimony was inadmissible, as it was relevant to show his efforts to isolate Diarra; he instead asserts that the "go f*ck yourself" statement impermissibly placed his character in issue by underscoring his "poor language." But without more, a curse word is not a "crime[ ], wrong[

27

], or act[ ]" within the scope of OCGA § 24-4-404 (b). In any event, we cannot say that the admission of Virger's statement in its vulgar form had any meaningful effect on the jury's verdicts, particularly because Virger used "f*ck" and other curse words in numerous text messages that were admitted into evidence. Thus, any error in this respect was harmless. See Smith v. State, 302 Ga. 717, 724 (808 SE2d 661) (2017) (explaining that offensive language used in a recording of the appellant's phone call from jail did not create a risk of unfair prejudice that substantially outweighed its probative value under OCGA § 24-4-403).[8]

(c)     Finally, Virger contends that the trial court erred by admitting improper character evidence in the form of testimony from Tina Chappell that Virger had abused her. Before Chappell testified for the State, Virger objected to Cave questioning Chappell about whether Virger had hit Chappell. The court overruled the objection but instructed the jury that the evidence of prior difficulties between Virger and Chappell should be considered solely as evidence of the feelings between them. In response to Cave's questions about

---

[8] Virger also argues that Norton improperly testified about his criminal history. The record shows, however, that the witness never referred to Virger's criminal record in front of the jury, and his claim therefore lacks merit.

28

the issue, Chappell admitted that during a police interview, she told a detective that Virger had hit her and that he had on one occasion grabbed her by her hair, thrown her to the floor, and beaten her.

The evidence that Virger abused Chappell was not introduced for one of the purposes listed in OCGA § 24-4-404 (b), but rather to show Chappell's bias with regard to Virger under OCGA § 24-6-622, which says, "The state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury." On direct examination, Chappell made several statements that were favorable to Virger; specifically, she testified that Virger had planned to adopt Diarra, that she had never seen him abuse Diarra, and that she had moved back in with Virger shortly after Diarra was killed. The evidence of Chappell's prior statement to the detective was admissible to show that her testimony that was beneficial to Virger may have been motivated by bias in his favor due to fear of his retaliation. See Rivers v. State, 296 Ga. 396, 402 (768 SE2d 486) (2015). While OCGA § 24-4-404 (b) is applicable to impeachment evidence, it did not preclude Cave from cross-examining Chappell for the legitimate purpose of showing the witness's bias. See Davis v. State, 302 Ga. 576, 582 (805 SE2d

29

859) (2017). And under OCGA § 24-4-403's balancing test, the probative value of that evidence was not substantially outweighed by unfair prejudice, particularly in light of the trial court's limiting instruction. See Lupoe, 300 Ga. at 245.

Contentions Raised Only by Cave

8. Cave also raises three claims relating to the trial court's admission of evidence that she contends improperly placed her character in issue in violation of OCGA § 24-4-404 (b). As with Virger's § 24-4-404 (b) claims, we conclude that none of these enumerations requires reversal.

(a) First, Cave asserts that the trial court erred by admitting evidence of an abortion she had about six weeks after Diarra's murder. When Cave objected to this evidence before trial, the prosecutor agreed that references to the abortion in Cave's recorded statements should be redacted, but argued that text messages from Cave to Virger that sought money for the abortion in connection with her deciding whether to "tell on" him were relevant to the concealment of the conspiracy between her and Virger. The trial court agreed. Accordingly, during the trial the State introduced evidence of Cave's abortion only through its mention within two text messages among several hundred texts included in the

30

co-defendants' phone records and in a 49-page demonstrative exhibit of relevant texts. The State redacted references to the abortion in Cave's recorded interviews; the only testimony about the abortion was elicited by Cave's own counsel during his direct examination of her.

In addition, during voir dire, the trial court allowed Cave's attorney to individually question prospective jurors about their views on abortion, and only one of the 15 jurors (including alternates) who were later selected expressed disapproval of abortion. Three other selected jurors said that they did not support abortion but that it was an individual choice, and the remaining 11 selected jurors said that they were pro-choice. Under all these circumstances, it is highly probable that, even assuming the brief references to Cave's abortion in the two text messages were improperly admitted, any error did not contribute to the jury's verdicts.

(b) During the State's direct examination of Chappell, the trial court admitted into evidence, over Cave's objection, testimony about two confrontations between Chappell and Cave. Chappell testified that during the first confrontation, which occurred two days after Diarra's death, Chappell and Cave hit each other and Cave made a comment about "sending [Chappell] to be

31

with [her] daughter." Chappell testified that during the second confrontation a few months later, Cave threw things at Chappell's car, threatened to kill her, and said that she did not know why Chappell was with Virger, "who had done awful things to [her] daughter."

The trial court properly admitted against Cave her statements to Chappell regarding Diarra's death as admissions by a party-opponent. See OCGA § 24-8-801 (d) (2) (A). And their physical confrontations were certainly indicative of the feelings between this witness and Cave. See OCGA § 24-6-622. But even assuming that some portion of Chappell's testimony about Cave's conduct during the confrontations should not have been admitted, that evidence was harmless. The jury heard and saw substantial other evidence, not challenged on appeal, about the hostility between Cave and Chappell, including dozens of text messages from Cave to Virger that disparaged Chappell, several of which referred to Chappell as "weak" and said that she "got her ass beat" by Cave, so the testimony about the two physical confrontations was largely cumulative. It is highly probable that any error in admitting this evidence did not contribute to the verdicts. See Douglas v. State, 303 Ga. 178, 183 (811 SE2d 337) (2018) (reasoning that any error in the admission of OCGA § 24-4-404 (b) evidence

32

was harmless because it was cumulative of facts established by other evidence).

(c)    Cave testified on direct examination that she was "emotionally unstable when it comes to [Virger]," that she hated his abuse but was completely dependent on him, and that he made her believe that no one else would love her. During cross-examination by the State, the prosecutor told the trial court during a bench conference that she intended to question Cave about text messages and photographs of a sexual nature that Cave had sent to other men. Cave objected based on character evidence, but the court overruled the objection. Back in front of the jury, the prosecutor asked Cave why she sent photographs of herself "to several other men." Cave replied, "I don't know about several." The prosecutor then moved on to another line of questioning.

Cave's testimony about her relationship with Virger opened the door for the State to rebut her claims with evidence that she was pursuing other men. See OCGA § 24-6-621 ("A witness may be impeached by disproving the facts testified to by the witness."). The prosecutor simply (and ineffectually) questioned Cave about why she sent photos of herself to other men, without even noting the sexual nature of those photos or getting a clear answer; the text messages and photos to which the prosecutor apparently was alluding were

33

included among the hundreds of pages of Cave's phone records that the State admitted into evidence near the beginning of the trial, but the prosecutor did not identify them, much less display them for the jury. The trial court did not abuse its discretion by allowing the prosecutor's question.

9. Cave contends that the trial court erred by excluding testimony from an expert witness that Cave has battered person's syndrome (BPS) and post-traumatic stress disorder (PTSD).[9] We disagree.

(a) A week before the trial began, Cave filed a notice of her intent to present the expert testimony of Dr. Marti Loring "under the authority of Pickle v. State, 280 Ga. App. 821 [(635 SE2d 197)] (2006) and for the purposes set forth in that opinion."[10] Cave's notice attached Dr. Loring's "psychological

---

[9] BPS has been described as a series of common characteristics that appear in individuals who are physically and psychologically abused over an extended period of time by a dominating person in their lives. See Johnson v. State, 266 Ga. 624, 626 (469 SE2d 152) (1996). Characteristics of BPS typically include cycles of violence and then contrition by the batterer, and victims often descend into a state of psychological paralysis in which they believe they are "'unable to take any action to improve or alter [their] situation.'" Id. at 626 nn. 4 & 5 (citation omitted).

[10] In Pickle, Judge Barnes's lead opinion held that the trial court erred, albeit harmlessly, in excluding expert testimony that the appellant suffered from BPS to negate her intent to commit the crimes charged; the appellant was convicted of numerous counts of first-degree child cruelty and other charges based on proof that she and her husband abused her daughter. See 280 Ga. App. at 821-830. The other two judges on the Court of Appeals panel joined only in the judgment on that issue, and wrote special concurrences to specifically disagree with Judge Barnes's position on the admissibility of such evidence to negate intent. See id. at 834-835 (Andrews, P. J., joined by Bernes, J., concurring specially in part); id. at 835-836 (Bernes, J., concurring specially in part). The court held unanimously, however, that the BPS evidence was inadmissible to support the appellant's

34

evaluation summary" for Cave, which concluded that Cave experienced BPS in her relationship with Virger and suffers from PTSD, but the notice and summary did not explain how those conditions were connected to any issue in Cave's case. The State quickly filed a motion in limine to exclude the evidence.

At a pretrial motions hearing later that day, Cave said that Dr. Loring would testify that Cave did not "act unreasonably" by failing to obtain medical assistance for Diarra in light of the physical abuse Cave had suffered. Cave asserted that the BPS and PTSD evidence provided a "comprehensive defense" that would "explain her conduct and . . . negate mens rea" and would also support her affirmative defense that Virger coerced her to commit the crimes.[11] Cave added that Dr. Loring's testimony would explain "why [Cave] acted," "why she did what she did." Later, when the court asked if Cave was offering the expert testimony on her "frame of mind" as a "mental-health defense," Cave replied, "That's correct, Judge." After a lunch break, when the court asked Cave to clarify if she was offering the BPS evidence "to show she lacked the requisite

justification defense of coercion. See id. at 830-832.

[11] "Mens rea" is the legal term for the state of mind or type of intent the State must prove the defendant had at the time she acted or failed to act in violation of a criminal statute. See OCGA § 16-2-1 (a) ("A 'crime' is a violation of a statute of this state in which there is a joint operation of an act or omission to act and intention or criminal negligence.").

35

intent," Cave again replied, "Correct."

The following day, the trial court issued an order granting the State's motion to exclude Dr. Loring's testimony, explaining that expert evidence of BPS is admissible only to assist the jury in evaluating a claim of self-defense, which was not an issue in this case. Citing this Court's decision in Thompson v. State, 295 Ga. 96 (757 SE2d 846) (2014), the court also ruled that evidence of diminished mental capacity that does not rise to the level of insanity is inadmissible to support other defenses or to negate mens rea.

After Cave testified at trial, she "renew[ed] [her] request" to allow Dr. Loring to testify, arguing that the testimony would "explain the evidence [that had] been introduced by the State" and "[Cave's] conduct in the context of this trial." Cave also briefly mentioned that the expert testimony could explain voicemail and text messages between Cave and Virger. The court said that it was satisfied with its previous ruling, adding that Cave had never admitted that she harmed Diarra. However, the court allowed Cave to extensively proffer Dr. Loring's testimony outside the presence of the jury. Cave did not ask the trial court to reconsider its ruling after the proffer.

(b)    In Smith v. State, 247 Ga. 612 (277 SE2d 678) (1981), this Court

36

first recognized BPS as a scientifically established theory and held that expert testimony regarding BPS may be admissible in murder cases to assist the jury in evaluating a defendant's claim of self-defense. See id. at 619. In 1993, the General Assembly codified this holding by amending the self-defense justification statute to address the use of BPS evidence. See Ga. L. 1993, p. 1716, § 2, codified as OCGA § 16-3-21 (d). That provision says, with emphasis added:

> In a prosecution for murder or manslaughter, *if a defendant raises as a defense a justification provided by subsection (a) of this Code section* [defense of self or others], the defendant, in order to establish the defendant's reasonable belief that the use of force or deadly force was immediately necessary, may be permitted to offer:
> (1) Relevant evidence that the defendant had been the victim of acts of family violence or child abuse *committed by the deceased*, as such acts are described in Code Sections 19-13-1 and 19-15-1, respectively; and
> (2) Relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense, including those relevant facts and circumstances relating to the family violence or child abuse that are the bases of the expert's opinion.

Since then, we have clearly and consistently held that the only defense theory that BPS is admissible to support is a justification defense based on self-defense against the victim. See Smith v. State, 268 Ga. 196, 199 (486 SE2d

37

819) (1997) ("It has long been the position of this Court that the battered person syndrome is not a separate defense, but that evidence of battered person syndrome is relevant in a proper case as a component of justifiable homicide by self-defense."). See also Demery v. State, 287 Ga. 805, 809 (700 SE2d 373) (2010) (reiterating that BPS "is not a separate defense but is 'an evidentiary component of the defense of justification'" (quoting Smith, 268 Ga. at 199)); Mobley v. State, 269 Ga. 738, 739 (505 SE2d 722) (1998) (explaining that "'[e]vidence of past physical abuse is admissible for the limited purpose of illustrating that [the] defendant had a reasonable belief in the imminence of additional physical abuse at the hands of the victim and that, therefore, she was presently justified in acting in self-defense'" (quoting Smith, 268 Ga. at 199)).

In this case, as the trial court recognized, Cave did not assert a claim of self-defense — nor could she, as she was obviously under no threat from the 13-month-old victim. See OCGA § 16-3-21 (a) (stating that a person is justified in using force against another person when she reasonably believes it is necessary to defend herself or a third person against the other person's imminent use of unlawful force). And we have consistently held that evidence of violent acts or abuse committed against the defendant by someone other than the victim —

38

including expert testimony about psychological conditions caused by such abuse — is inadmissible to support a justification defense based on self-defense. See, e.g., Pena v. State, 297 Ga. 418, 423 (774 SE2d 652) (2015) (holding that evidence of the defendant's PTSD stemming from abuse he experienced during childhood, offered to support his claim of self-defense based on BPS, was properly excluded because "evidence of abuse or violent acts committed against a defendant by someone other than the victim is not admissible to support a justification defense"); O'Connell v. State, 294 Ga. 379, 381-382 (754 SE2d 29) (2014) (concluding that evidence of the defendant's BPS and PTSD based on abuse by individuals other than the victim was inadmissible to support her claim of self-defense); Freeman v. State, 269 Ga. 337, 339 (496 SE2d 716) (1998) (concluding that OCGA § 16-3-21 (d) limits a self-defense claim based on BPS to "situations in which the defendant was the victim of family violence or child abuse committed by the deceased," so the defense was available to the defendant for the murder of his stepfather, who had abused him, but not for the murder of the stepfather's friend).

Georgia's appellate courts have similarly rejected attempts to extend the use of evidence regarding the defendant's BPS or other psychological conditions

39

to support other affirmative defenses that traditionally and statutorily require application of an objective, reasonable-person standard, including the defense of coercion, see OCGA § 16-3-26 ("A person is not guilty of a crime, except murder, if the act upon which the supposed criminal liability is based is performed under such coercion that the person *reasonably* believes that performing the act is the only way to prevent his imminent death or great bodily injury." (emphasis added)). See, e.g., Allen v. State, 296 Ga. 785, 790-791 (770 SE2d 824) (2015) (holding that the trial court properly excluded as irrelevant a psychiatrist's testimony that the defendant was "susceptible to being 'led' into crime by another person to a greater extent than most people," proffered in support of a coercion defense, because that defense is "predicated on the reasonable person standard, not the subjective situation of the defendant"); Pickle, 280 Ga. App. at 830-832 (unanimously affirming the exclusion of expert testimony regarding the defendant's BPS to support her coercion defense); Graham v. State, 239 Ga. App. 429, 431-432 (521 SE2d 249) (1999) (same). Accordingly, the proffered expert testimony regarding Cave's BPS and PTSD

also was not admissible to support her defense of coercion.[12]

(c)     Cave contends that the expert testimony was nevertheless admissible because it would have explained to the jury her "conduct" after Virger beat Diarra.  During the trial, when Cave renewed her request to allow Dr. Loring's testimony after Cave testified, she also asserted generally that the expert would explain text and voicemail messages between Cave and Virger.  During the subsequent proffer, Dr. Loring testified about how "nasty text messages" may be typical between an individual with BPS and her abuser.  That and similar pieces of testimony might have been admissible for the sole purpose of explaining Cave's behavior in order to support her credibility as a witness.  See, e.g., Horne v. State, 333 Ga. App. 353, 355 (773 SE2d 467) (2015) (explaining that expert testimony about BPS may be relevant to explain why the victim recanted her allegations of abuse against the defendant).

But that was not clearly the purpose for which Cave offered the evidence when she "renew[ed]" her request to admit Dr. Loring's testimony.  Cave did

_____

[12]  We therefore need not decide in this case whether the defense of coercion was even available as to Cave's felony murder charges.  See OCGA § 16-3-26 (stating that coercion is not a defense to "murder").  See also Kelly v. State, 266 Ga. 709, 711 (469 SE2d 653) (1996) (reserving the question).

41

not inform the trial court that she no longer sought to use the expert testimony for the purposes she had proposed during the pretrial proceeding, and she cited no authority before or during the trial to support its admission on other grounds. Under these circumstances, the trial court fairly understood Cave to be renewing her original motion to admit Dr. Loring's testimony for the purposes of negating Cave's intent to commit the crimes and supporting her coercion defense.[13]

In that motion and the lengthy pretrial hearing on the issue, Cave repeatedly argued to the trial court, relying on Judge Barnes's solo opinion in Pickle, that Dr. Loring's testimony would present a "comprehensive defense" that would "negate criminal intent as to all the counts." Cave mentioned "conduct" only in the context of asserting that the BPS evidence would "explain her conduct *and negate mens rea*." Thus, as Cave expressly acknowledged to the trial court — and as Cave's counsel acknowledged again at oral argument before this Court — the purpose of the expert evidence was to negate the intent elements of the crimes with which she was charged. Cave wanted Dr. Loring

---

[13] As to the latter purpose, on the key issue of obtaining medical care for Diarra after Cave noticed that the child was injured, Cave elicited testimony from Dr. Loring that "[p]eople who experience the battered person syndrome and PTSD are more vulnerable to being coerced," the sort of testimony squarely rejected by Georgia precedent. See, e.g., Allen, 296 Ga. at 790-791.

42

to explain to the jury not *what* she did or failed to do regarding Diarra's injuries and resulting pain (Cave's conduct), but rather "*why* she did what she did" (Cave's mental condition at the time of her conduct). And under this Court's longstanding precedent, the trial court correctly rejected the admission of the expert testimony for that purpose.

As we recently reiterated, evidence of a criminal defendant's mental disability at the time of the alleged offense may be admissible to support the defenses of insanity, see OCGA § 16-3-2, delusional compulsion, see OCGA § 16-3-3, or self-defense based on BPS in a murder or manslaughter prosecution, see OCGA § 16-3-21 (d).[14]  See Thompson v. State, 295 Ga. 96, 99 & n.2 (757 SE2d 846) (2014). "For more than 150 years, however, this Court has consistently upheld the exclusion of evidence of a defendant's diminished mental condition when offered to support other defenses or to negate the intent element of a crime." Id. at 99 (collecting cases dating back to 1849). See also Paslay v. State, 285 Ga. 616, 617-618 & n.2 (680 SE2d 853) (2009) (affirming

---

[14]  In addition, evidence of a defendant's mental disability may be presented to support a claim of incompetency to stand trial, see OCGA § 17-7-130, or (since such pleas were authorized) a plea of guilty but mentally ill or guilty but with intellectual disability, see OCGA § 17-7-131.  See Thompson, 295 Ga. at 99.

43

the exclusion of testimony by Dr. Loring and a lay witness regarding the defendant's abuse by the victim for the "stated purpose of . . . put[ting] the remainder of the evidence in perspective by showing that Paslay was undergoing emotional and physical turmoil at the time of the crimes"); Paul v. State, 274 Ga. 601, 603 n. 4 (555 SE2d 716) (2001) (holding that expert testimony that the defendant was "prone to perceptual inaccuracies and distortions" tending to show his lack of intent to kill was "irrelevant to the state of mind necessary to determine guilt" in light of the defendant's refusal to assert an insanity or mental illness defense); Selman v. State, 267 Ga. 198, 200 (475 SE2d 892) (1996) (holding that expert testimony regarding the defendant's paranoia and fear of the victim was inadmissible to explain why he killed the victim, when the defendant had not raised an insanity or mental illness defense); Johnson v. State, 266 Ga. 624, 625-626 (469 SE2d 152) (1996) (concluding that expert testimony explaining the defendant's PTSD-like "explosive rage and fear which led to his unprovoked killing of an unarmed man" was properly excluded as irrelevant to the defendant's justification defense); Brower v. State, 334 Ga. App. 262, 265-267 (779 SE2d 32) (2015) (relying on Thompson to affirm the exclusion of Dr. Loring's expert testimony that the defendant "could not form the requisite intent

to commit the crimes charged because she suffered from PTSD").

As we recognized in Thompson,

> Georgia takes a more restrictive position on this issue than many other jurisdictions, where the admission of evidence relating to a defendant's deficient mental condition to support defenses other than those based on diminished mental capacity or to negate a required element of a crime has been authorized by statute or judicial decision in at least some circumstances.

295 Ga. at 100 (citing Paul H. Robinson et al., Criminal Law Defenses, Vol. 1, § 64 (a) (2013)). We are not alone, however, in our adherence to the traditional position on this issue.

For example, in State v. Mott, 931 P2d 1046 (Ariz. 1997), the defendant was charged with murder and child abuse based in part on not taking her daughter to a hospital after her boyfriend beat the child, who later died. See id. at 1048-1049. The trial court excluded expert evidence on BPS offered to show that the defendant could not have formed the requisite intent to commit the crimes. See id. at 1049. In affirming that ruling, the Arizona Supreme Court explained that the state's legislature had not adopted the defense of diminished capacity and the state's courts had consistently rejected such a defense, refusing to allow psychiatric testimony offered to negate intent. See id. at 1050-1057.

45

The court also held that this limitation did not violate due process under the United States Constitution. See id. at 1051-1055. We note that the United States Supreme Court has since held that Arizona's Mott rule does not violate due process "in restricting consideration of defense evidence of mental illness and incapacity to its bearing on a claim of insanity." Clark v. Arizona, 548 U.S. 735, 742 (126 SCt 2709, 165 LE2d 842) (2006). See also Fisher v. United States, 328 U.S. 463, 476 (66 SCt 1318, 90 LE 1382) (1946) (holding that District of Columbia courts were not constitutionally required to instruct juries on mental deficiencies that did not rise to the level of insanity and noting that "such a requirement for criminal trials would involve a fundamental change in the common law theory of responsibility").[15]

If Georgia's longstanding law is to be changed to allow the admission of expert testimony in criminal cases to negate intent or otherwise support a mental capacity defense other than the ones now authorized by statute, that change

---

[15] For cases from other states that have continued to apply the traditional all-or-nothing approach to mental capacity defenses, see, e.g., State v. Dressner, 255 S3d 537, 548 (La. 2018); State v. Poppelriter, 50 NE3d 270, 276-278 (Ohio Ct. App. 2015); State v. Maestas, 316 P3d 724, 736 (Kan. 2014); Miller v. State, 99 S3d 349, 390 (Ala. Crim. App. 2011); State v. Anderson, 789 NW2d 227, 237 (Minn. 2010); Keats v. State, 115 P3d 1110, 1119 (Wyo. 2005); People v. Carpenter, 627 NW2d 276, 283-285 (Mich. 2001); Commonwealth v. Finstein, 687 NE2d 638, 640 (Mass. 1997); and State v. Klafta, 831 P2d 512, 517 (Haw. 1992).

should come from the General Assembly. See Thompson, 295 Ga. at 100. See also Fisher, 328 U.S. at 476 ("Such a radical departure from common law concepts is more properly a subject for the exercise of legislative power."). The trial court did not abuse its discretion in excluding Cave's proffered expert testimony.[16]

10. Shortly after the trial court issued its order excluding Dr. Loring's expert testimony, Cave filed a motion for a continuance on the ground that she needed more time to prepare her defense. But the court had already granted a continuance motion that Cave filed two months earlier, and she has not shown or even asserted what additional evidence she would have presented had the court granted her a second continuance. See Phoenix v. State, 304 Ga. 785, 789 (822 SE2d 195) (2018) ("'To show harm [from the denial of a continuance], [the defendant] is required to specifically identify what other evidence or witnesses [s]he would have put forth in [her] defense if [her] counsel had been given more time to prepare; speculation and conjecture are not enough.'" (citation omitted)).

---

[16] We accordingly disapprove Pickle to the extent Judge Barnes's opinion held that similar evidence was admissible. See 280 Ga. App. at 828-830. We also disapprove the Court of Appeals' opinion in Porter v. State, 243 Ga. App. 498 (532 SE2d 407) (2000), to the extent it is inconsistent with our opinion in this case.

Accordingly, Cave has not shown that the trial court abused its discretion in denying the continuance.

Judgments affirmed. All the Justices concur.

Decided February 18, 2019.

Murder. Douglas Superior Court. Before Judge Emerson.

Miller & Key, J. Scott Key, Kayci N. Timmons, for appellant (case no. S18A1538).

James K. Luttrell, for appellant (case no. S18A1539).

Ryan R. Leonard, District Attorney, Sean A. Garrett, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.